[No. B115423. Second Dist., Div. One. Sept. 15, 1998.]

CHEYANNA M., a Minor, etc., Plaintiff and Appellant, v.
A.C. NIELSEN COMPANY et al., Defendants and Respondents;

ISABEL M. et al., Plaintiffs and Respondents, v.
A.C. NIELSEN COMPANY et al., Defendants and Respondents.

**COUNSEL**

Grassini & Wrinkle and Roland Wrinkle for Plaintiff and Appellant.

Glickman & Glickman and Steven C. Glickman for Plaintiffs and Respondents.

Cummins & White, David B. Shapiro, Michael T. Fox, Michael M. Bergfeld, Roper & Folino, James L. Roper and John M. Bergerson for Defendants and Respondents.

## OPINION

**MASTERSON, J.**—In this wrongful death action, Cheyanna, a minor born out of wedlock, seeks compensation for the death of her alleged father, David. Cheyanna was born after David was killed. The trial court ruled that Cheyanna lacked standing to pursue a wrongful death action because she could not establish that David was her father. Cheyanna appeals that determination. We reverse.

### BACKGROUND

In May 1995, David met Angela in Desert Hot Springs. David was there visiting his brother, and Angela was visiting her aunt. Neither was married. A few days after they met, David and Angela began having sexual relations. They had sexual intercourse several times over a period of approximately 11 days. David used a condom on all but one occasion.

While still in Desert Hot Springs, Angela took a home pregnancy test, which indicated that she was pregnant.[1] Angela told David that she was pregnant. He asked her what she was going to do. She said she did not know. David told Angela that he would leave that decision up to her.

In late May or early June 1995, David left Desert Hot Springs and returned to the Los Angeles area, where he lived with his parents. Angela returned to her home in Banning. Angela did not see David again. She spoke to him once by telephone and asked him if he wanted to see a sonogram of the baby. He said yes and told her that he would come to see her. He never came. Nor did he acknowledge to Angela that he was the baby's father.

On one occasion, Angela's mother tried to reach David by telephone at his parents' home. She ended up talking to David's mother, telling her that David could see the baby after it was born. Later, David's mother asked him if he was the baby's father. He said he did not believe so because he had been with Angela for such a short time. According to his parents, David never held out the baby as his own.[2] One of David's close friends, Heriberto Sicairos, stated that David did not tell him anything about Angela or the baby.

---

[1] Angela had not engaged in sexual relations during the eight-month period before she met David. She had completed a menstrual cycle a couple of weeks before going to Desert Hot Springs.

[2] In their declarations, David's parents stated that he "never held out the child as his own." Although these declarations were the subject of various objections, Cheyanna does not contend that the trial court ruled on them. "Because counsel failed to obtain rulings, the objections are waived and are not preserved for appeal. . . . [F]or purposes of this appeal we must view the objectionable evidence as having been admitted in evidence and therefore as

On or about November 11, 1995, David was walking across a street in South Gate when he was hit by an automobile. He died from his injuries. Cesar Hernandez was driving the vehicle, which was registered to his employers, A.C. Nielsen Company and Dun & Bradstreet, Inc.

On February 2, 1996, Angela gave birth to Cheyanna. David's parents asked Angela to move in with them so they could be close to the baby. Angela did so. Cheyanna refers to David's mother as "ma," meaning "grandma," and to David's father as "da," meaning "grandpa." David's parents have told several people that Cheyanna is their granddaughter.[3]

In August 1996, Cheyanna filed this wrongful death action, with Angela acting as her guardian ad litem. Named as defendants were Hernandez, A.C. Nielsen Company, and Dun & Bradstreet, Inc. A separate wrongful death action was filed by David's parents. The two actions were consolidated. In October 1996, the trial court disqualified Angela from acting as Cheyanna's guardian ad litem and appointed Attorney Paul Fukushima to serve in that capacity.[4] The trial court also ordered the South Gate Police Department to produce a sample of David's blood.

In connection with David's death, criminal charges were brought against Hernandez. He was convicted. At the sentencing hearing, one of David's brothers stated that David "has a daughter [and] now she can't see her dad." David's mother also spoke at the hearing, saying, "I have [David's] daughter at home with me. Every time I look at her, it is a reminder of what I lost, but it also soothes the pain that I feel . . . ."

In May 1997, David's parents filed a motion for summary judgment, contending that Cheyanna lacked standing to maintain a wrongful death action.[5] David's parents argued that, to have standing, Cheyanna had to be an "heir" within the meaning of the laws of intestate succession (Prob. Code, §§ 6400-6455). They asserted that she was not an heir because David did not openly hold her out as his child. (See Prob. Code, § 6453, subd. (b)(2).)

In response, Cheyanna argued that standing under the wrongful death statute should not be determined by the laws of intestate succession, but

part of the record." (*Ann M.* v. *Pacific Plaza Shopping Center* (1993) 6 Cal.4th 666, 670, fn. 1 [25 Cal.Rptr.2d 137, 863 P.2d 207], citations omitted.)

[3]In moving for summary judgment, David's parents stated that they did not believe David was Cheyanna's father. At her deposition, David's mother testified that "[i]t was easier to say that [Cheyanna] was my granddaughter rather than go into an explanation of paternity with people."

[4]The trial court removed Angela as guardian ad litem because she had improperly agreed to give David's parents half of any award recovered by Cheyanna.

[5]The motion was captioned as one for summary adjudication. However, the trial court treated the motion as one for summary judgment since it disposed of Cheyanna's claims against all defendants. No one challenges this aspect of the case.

should instead be governed by the Uniform Act on Blood Tests to Determine Paternity (Fam. Code, §§ 7550-7558).[6] Cheyanna further claimed that, even if the laws of intestate succession determine standing in a wrongful death action, she need not prove that David held her out as his child. Given that David died before she was born, Cheyanna asserted that it was impossible for him to hold her out as his "child," i.e., as a human being born alive. In the event of such impossibility, the laws of intestate succession permit a child to establish a parent-child relationship through clear and convincing evidence of paternity. (See Prob. Code, § 6453, subd. (b)(3).)

The trial court ruled that Cheyanna's standing to bring a wrongful death action was determined by the right to inherit under the laws of intestate succession. The court concluded that Cheyanna was not an heir because David had not held her out as his child. Accordingly, the trial court granted the summary judgment motion and entered judgment in favor of all defendants. As a result, David's parents are the only plaintiffs in the action.[7] Cheyanna filed a timely appeal from the judgment.[8]

## DISCUSSION

Summary judgment is appropriate if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).)

■ " 'A defendant seeking summary judgment has met the burden of showing that a cause of action has no merit if that party has shown that one

---

[6]At the time of the summary judgment proceedings, section 7551 of the Family Code provided: "In a civil action or proceeding in which paternity is a relevant fact, the court may upon its own initiative or upon suggestion made by or on behalf of any person whose blood is involved, and shall upon motion of any party to the action or proceeding made at a time so as not to delay the proceedings unduly, order the mother, child, and alleged father to submit to blood tests. . . ." As of January 1, 1998, section 7551 was amended to refer to "genetic" tests rather than "blood" tests. (Stats. 1997, ch. 599, § 36.)

[7]Under the laws of intestate succession, the decedent's entire estate passes to his children if there is no surviving spouse. (Prob. Code, § 6402, subd. (a).) If there is no surviving spouse or child, the decedent's parents take the entire estate. (*Id.*, subd. (b).) Thus, assuming that the intestacy laws determine standing in a wrongful death action, David's parents are the sole plaintiffs because David did not have a surviving spouse and, under the trial court's ruling, he did not have any children.

[8]A month after the entry of judgment, Cheyanna moved the trial court to vacate the judgment based on newly discovered evidence (i.e., statements that David purportedly made to two friends). The trial court denied the motion, finding that the new evidence was not competent to show that David had held Cheyanna out as his child. In her opening brief on appeal, Cheyanna does not challenge the trial court's ruling. We therefore treat the ruling as correct and do not consider the incompetent evidence submitted in support of the motion to vacate the judgment. (See *Landry* v. *Berryessa Union School Dist.* (1995) 39 Cal.App.4th 691, 699-700 [46 Cal.Rptr.2d 119]; *Kim* v *Sumitomo Bank* (1993) 17 Cal.App.4th 974, 979 [21 Cal.Rptr.2d 834].)

or more elements of the cause of action cannot be established [or that there is a complete defense to that cause of action]. . . . Once the defendant's burden is met, the burden shifts to the plaintiff to show that a triable issue of fact exists as to that cause of action. . . . In reviewing the propriety of a summary judgment, the appellate court independently reviews the record that was before the trial court. . . . We must determine whether the facts as shown by the parties give rise to a triable issue of material fact. . . . In making this determination, the moving party's affidavits are strictly construed while those of the opposing party are liberally construed.' . . . We accept as undisputed facts only those portions of the moving party's evidence that are not contradicted by the opposing party's evidence. . . . In other words, the facts alleged in the evidence of the party opposing summary judgment and the reasonable inferences therefrom must be accepted as true." (*A-H Plating, Inc.* v. *American National Fire Ins. Co.* (1997) 57 Cal.App.4th 427, 433-434 [67 Cal.Rptr.2d 113], citations omitted.)

As stated, Cheyanna argues that her standing to maintain an action for wrongful death should be determined by the Uniform Act on Blood Tests to Determine Paternity, not the laws of intestate succession. She further contends that even if the laws of intestate succession apply, she has standing to sue for wrongful death. Finally, she claims that if she does not have standing to sue, then the wrongful death statute unlawfully discriminates against illegitimate children in violation of the equal protection clause of the federal Constitution.

We conclude that Cheyanna's standing to bring a wrongful death action must be determined in accordance with the laws of intestate succession, but we also find that there are triable issues as to whether she has standing to sue. We therefore reverse the judgment.[9]

A. *Standing to Bring a Wrongful Death Action*

California's first wrongful death statute was enacted in 1862. (Stats. 1862, ch. 330, §§ 1-4, pp. 447-448.) In 1872, the statute was codified as former section 377 of the Code of Civil Procedure (section 377). (See Historical Note, 14 West's Ann. Code Civ. Proc. (1973 ed.) § 377, pp. 59-60.) At the time of its repeal in 1992, section 377 provided in relevant part:

"(a) When the death of a person is caused by the wrongful act or neglect of another, his or her *heirs* or personal representatives on their behalf may maintain an action for damages against the person causing the death . . . .

---

[9]Because we reverse the judgment on statutory grounds, we do not address Cheyanna's constitutional challenge to the wrongful death statute.

"(b) For the purposes of subdivision (a), '*heirs*' means only the following:

"(1) Those persons who would be entitled to succeed to the property of the decedent according to the provisions of Part 2 (commencing with Section 6400) of Division 6 of the Probate Code[, i.e., the intestacy laws] . . . ." (Stats. 1983, ch. 842, § 12, pp. 3022-3023, italics added, repealed by Stats. 1992, ch. 178, § 19, p. 890; see Historical Note, 14 West's Ann. Code Civ. Proc., *supra*, § 377, at pp. 60-61; Historical and Statutory Notes, 14 West's Ann. Code Civ. Proc. (1998 pocket supp.) § 377, pp. 19-20.)[10]

In construing section 377, our Supreme Court stated: "[W]e are persuaded that the Legislature intends to occupy the field of recovery for wrongful death. For this reason the remedy remains a creature of statute in California . . . regardless of whether a cause of action for wrongful death did or did not exist at common law. . . . [¶] Because it is a creature of statute, the cause of action for wrongful death 'exists only so far and in favor of such person as the legislative power may declare.' " (*Justus* v. *Atchison* (1977) 19 Cal.3d 564, 575 [139 Cal.Rptr. 97, 565 P.2d 122], citations omitted, disapproved on other grounds in *Ochoa* v. *Superior Court* (1985) 39 Cal.3d 159, 171 [216 Cal.Rptr. 661, 703 P.2d 1].)

The high court also explained that "[i]t is well settled that the right to bring an action for the wrongful death of a human being is limited to the persons described in Code of Civil Procedure section 377. . . . The use of the word 'heirs' in section 377 has been narrowly interpreted as limiting this class of persons to those *who would have been eligible to inherit from the decedent's estate had he died intestate.*" (*Steed* v. *Imperial Airlines* (1974) 12 Cal.3d 115, 119 [115 Cal.Rptr. 329, 524 P.2d 801, 68 A.L.R.3d 1204], citations omitted, italics added; accord, *Mayo* v. *White* (1986) 178 Cal.App.3d 1083, 1088 [224 Cal.Rptr. 373].)

In 1992, the Legislature repealed section 377 and enacted the present wrongful death statute, codified as sections 377.60 to 377.62 of the Code of Civil Procedure. (Stats. 1992, ch. 178, §§ 19-20, pp. 890, 893-894; Cal. Law Revision Com. com., 14 West's Ann. Code Civ. Proc. (1998 pocket supp.) § 377, pp. 19-20.) Section 377.60, subdivision (a), of the Code of Civil Procedure (section 377.60(a)) provides:

"A cause of action for the death of a person caused by the wrongful act or neglect of another may be asserted by any of the following persons or by the decedent's personal representative on their behalf:

---

[10]Subdivision (b)(2) of section 377 authorized wrongful death actions by "putative" spouses, among others. (Stats. 1983, ch. 842, § 12, p. 3023.) Subdivision (b)(3) of the statute authorized such actions by dependent minors who had resided in the decedent's household. (Stats. 1983, ch. 842, § 12, p. 3023.)

"(a) The decedent's surviving spouse, *children*, and issue of deceased children, or, if there is no surviving issue of the decedent, the persons, including the surviving spouse, who would be entitled to the property of the decedent by intestate succession." (Italics added.)[11]

■ Cheyanna correctly points out that while the former wrongful death statute allowed "heirs" to bring suit, section 377.60(a) confers that right on the decedent's "children," among others. Because section 377.60(a) does not define "children," Cheyanna argues that paternity should be determined in accordance with the Uniform Act on Blood Tests to Determine Paternity. That act authorizes the use of blood tests in any civil action where paternity is an issue. (Fam. Code, § 7551; see fn. 6, *ante*.) David's parents, on the other hand, contend that we should look to the intestacy laws to determine whether Cheyanna is among the "children" who can bring a wrongful death action.

Faced with two different statutory schemes for defining "children," we examine the legislative history of the wrongful death statute for guidance. (See *In re York* (1995) 9 Cal.4th 1133, 1142 [40 Cal.Rptr.2d 308, 892 P.2d 804].) That examination leads us to conclude that the laws of intestate succession determine whether Cheyanna can bring an action under section 377.60(a).

In *Phraner* v. *Cote Mart, Inc.* (1997) 55 Cal.App.4th 166 [63 Cal.Rptr.2d 740], the plaintiff, an adopted child, brought a wrongful death action against the persons allegedly responsible for the death of her *biological* mother. The Court of Appeal held that the plaintiff lacked standing because, under the laws of intestate succession, the adoption had terminated the parent-child relationship between the plaintiff and the decedent. The court stated:

"[The plaintiff] relies heavily on the 1992 repeal of section 377 and its reenactment as section 377.60, in which the term 'heir' was replaced by 'children.' She asserts the change is indicative of legislative intent to include children previously adopted in the class of people permitted to bring a wrongful death action. But the legislative history and case law indicate otherwise. The change was intended to allow the children of a decedent to maintain an action for the wrongful death of a parent even though the parent's entire estate was community property bequeathed to the surviving spouse. Essentially, those children who are not heirs only because the estate

---

[11]Like its predecessor, the present wrongful death statute permits an action to be brought by "putative" spouses and certain other dependents, including minors who resided in the decedent's household. (Code Civ. Proc., § 377.60, subds. (b), (c).) In this case, none of the parties contend that these provisions are applicable.

consists entirely of community property may now assert a claim. . . . *The change in the language was not a broadening of the statute, but a mere clarification.*

". . . . . . . . . . . . . . . . . . . . . . . .

". . . [T]he statutory right to bring a wrongful death action under section 377.60, subdivision (a) is grounded *in the right to inherit from the decedent.* Thus, whether an adopted child is considered a child of her biological parent *for purposes of intestate succession* is highly relevant to the definition of 'children' in section 377.60.

"[The plaintiff] correctly asserts the 'purpose behind the wrongful death statute is to provide compensation for the loss of companionship and other losses resulting from decedent's death.' . . . She suggests we judicially create standing in wrongful death actions for children who maintain a relationship with their biological parent even after adoption. However, [the plaintiff], ' "like any number of other persons who, in particular cases, may suffer injury . . . and personal loss by the death of an individual, is without legal recourse absent specific statutory remedy." . . .' . . . Granting standing to [the plaintiff] would expand the category of people able to recover for the loss beyond that which was contemplated by the Legislature in drafting the statute. We decline to do so." (55 Cal.App.4th at pp. 169-170, citations and fn. omitted, italics added.)

Moreover, the California Law Revision Commission has explained that the reference to "children" in section 377.60(a) simply restates the provisions of the former wrongful death statute *"without substantive change,* except as discussed below. . . . [¶] Subdivision (a) [of section 377.60] revises the language of former Section 377(b)(1) to refer specifically to the decedent's surviving spouse, children, and issue of deceased children, as proper parties plaintiff in a wrongful death action. This makes clear that, even if the decedent's estate is entirely community property, the decedent's children and issue of deceased children are proper parties plaintiff, along with the decedent's surviving spouse. *This codifies Fiske* v. *Wilkie,* 67 Cal.App.2d 440, 444, 154 P.2d 725 (1945). . . ." (Cal. Law Revision Com. com., 14 West's Ann. Code Civ. Proc. (1998 pocket supp.) § 377.60, p. 47, italics added.)

In sum, although section 377.60(a) differs from its predecessor in that it permits a wrongful death action to be brought by the decedent's "children," as opposed to "heirs," the Legislature did not intend to broaden standing under the statute. Rather, section 377.60(a) was enacted to codify our

holding in *Fiske* v. *Wilkie* (1945) 67 Cal.App.2d 440, 444 [154 P.2d 725], that the intestacy laws permit a decedent's children to maintain a wrongful death action even if the decedent's entire estate passes to a surviving spouse. (See *Desplancke* v. *Wilson* (1993) 14 Cal.App.4th 631, 633-635 [17 Cal.Rptr.2d 586].) Consequently, under section 377.60(a), standing to bring a wrongful death action remains linked to the intestacy laws. (See *Phraner* v. *Cote Mart, Inc.*, *supra*, 55 Cal.App.4th at pp. 169-170.) We must therefore determine whether Cheyanna is an "heir" under the laws of intestate succession.[12]

In arguing that the intestacy laws do not govern standing under section 377.60(a), Cheyanna relies on cases that are either inapposite or distinguishable. In *Marks* v. *Lyerla* (1991) 1 Cal.App.4th 556 [2 Cal.Rptr.2d 63], the plaintiff (a grandmother) brought a wrongful death action against her daughter-in-law, alleging that the latter had murdered her own daughter (the plaintiff's granddaughter). The grandmother claimed that she had standing to sue because Probate Code section 250 precludes a murderer from taking any of the victim's property through intestate succession. The court rejected this contention. As the court noted, the wrongful death statute (§ 377) defined "heir" as " '. . . [t]hose persons who would be entitled to succeed to the property of the decedent according to the provisions of *Part 2 (commencing with Section 6400) of Division 6 of the Probate Code* . . . .' " (1 Cal.App.4th at p. 560.) Because Probate Code section 250, which disinherits a murderer, is not within part 2 of division 6 of the code, the court concluded that the decedent's sole surviving heir was her mother and alleged murderer. (1 Cal.App.4th at pp. 560-561.)

As we read it, *Marks* illustrates the principle that "[t]he category of persons eligible to bring wrongful death actions is strictly construed." (*Marks* v. *Lyerla*, *supra*, 1 Cal.App.4th at p. 560; accord, *Lewis* v. *Regional Center of the East Bay* (1985) 174 Cal.App.3d 350, 355 [220 Cal.Rptr. 89].) In fact, *Marks* recognized that standing under the wrongful death statute is determined by the laws of intestate succession. In rejecting the grandmother's standing argument the court stated: "[U]nder *the intestacy scheme incorporated into section 377*, parents have priority over more remote relatives, such as grandparents." (1 Cal.App.4th at p. 560, italics added.)

Cheyanna's reliance on out-of-state cases is also misplaced. In *Brookbank* v. *Gray* (1996) 74 Ohio St.3d 279 [658 N.E.2d 724], the court interpreted the

---

[12]Our conclusion does not render superfluous the Uniform Act on Blood Tests to Determine Paternity (Fam. Code, §§ 7550-7558). Family Code section 7551, which was enacted in 1992 to replace Evidence Code section 892, determines paternity in child support cases. (See Cal. Law Revision Com. com., 29E West's Ann. Fam. Code (1994 ed.) § 7551, p. 139; *County of El Dorado* v. *Schneider* (1987) 191 Cal.App.3d 1263 [237 Cal.Rptr. 51]; see also fn. 6, *ante*.)

Ohio wrongful death statute, which provided that " '[a]n action . . . shall be brought . . . for the exclusive benefit of the surviving spouse, the *children*, and the parents of the decedent . . . .' " (*Id.* at p. 281, fn. 1 [658 N.E.2d at p. 726], italics added.) In construing the word "children," which the legislature had not defined, the court noted that the wrongful death statute "does *not* incorporate 'heirship' into its provisions." (*Id.* at p. 284 [658 N.E.2d at p. 728], italics added.) The court held that standing in a wrongful death action should be determined without reference to the laws regarding inheritance. (*Id.* at pp. 281-287 [658 N.E.2d at pp. 726-730].) In *Garza* v. *Maverick Market, Inc.* (Tex. 1989) 768 S.W.2d 273, the Texas Supreme Court reached the same conclusion in applying the Texas wrongful death statute. (*Id.* at pp. 275-276.) However, neither decision is pertinent here because, in enacting the relevant part of California's wrongful death statute (§ 377.60(a)), the Legislature has indicated that standing is to be determined with reference to the laws of intestate succession.[13]

### B. *Existence of a Parent-child Relationship*

 We now turn to the question of whether Cheyanna is an heir under the laws of intestate succession. Because this case comes to us on appeal from a summary judgment, Cheyanna need not establish that she is an heir as a matter of law. Instead, she need only show that there is a triable issue as to whether she is an heir.

To answer the question before us, we begin by examining the intestacy laws. We then turn to other statutes and to legislative history materials. Ultimately, we conclude that Cheyanna may be an heir and that summary judgment was improperly granted.

As stated, David did not have a spouse. Consequently, under the laws of intestate succession, his entire estate would pass to his "issue," if any. (Prob. Code, § 6402, subd. (a).) If David has no "issue," the entire estate goes to his parents. (*Id.*, subd. (b).)

The "issue" of a person is defined as "all [of] his or her lineal descendants of all generations, with the *relationship of parent and child* at each generation being determined by the definitions of *child* and *parent.*" (Prob. Code, § 50,

---

[13]In *Brookbank* v. *Gray, supra*, 74 Ohio St.3d at pages 283-285 [658 N.E.2d at pages 728-729], and *Garza* v. *Maverick Market, Inc., supra*, 768 S.W.2d at page 275, the courts discussed policy reasons as to why standing in a wrongful death action should not be based on statutory provisions regarding the right to inherit. In California, the Legislature has already weighed those factors and has come to a different conclusion. Our task is to apply the California statute in accordance with legislative intent. (See *Adoption of Kelsey S.* (1992) 1 Cal.4th 816, 826 [4 Cal.Rptr.2d 615, 823 P.2d 1216].)

italics added.) "Child" means "any individual entitled to take as a child under this code by intestate succession from the parent whose relationship is involved." (*Id.*, § 26.) "Parent" is defined as "any individual entitled to take as a parent under this code by intestate succession from the child whose relationship is involved." (*Id.*, § 54.)

"[A] *relationship of parent and child* exists between a person and the person's *natural parents*, regardless of the marital status of the natural parents." (Prob. Code, § 6450, subd. (a), italics added.) "Natural parent" is defined by Probate Code section 6453. For purposes of the present case, a biological father is a "natural parent" if "[p]aternity is established by clear and convincing evidence that the father has openly held out the child as his own." (Prob. Code, § 6453, subd. (b)(2).) However, if "[i]t was impossible for the father to hold the child out as his own," the biological father is a "natural parent" if "paternity is established by clear and convincing evidence." (*Id.*, subd. (b)(3).)[14]

Thus, if David *could* have held Cheyanna out as his "child," and there is clear and convincing evidence that he did so, Cheyanna would be an heir under the intestacy laws. If it was *impossible* for David to hold Cheyanna out as his "child," she would be an heir if there is clear and convincing evidence of David's paternity. Under both alternatives, Cheyanna must present evidence that is clear and convincing. But the first alternative requires proof of a specific act—that David held Cheyanna out as his "child." The second alternative simply requires proof that David was Cheyanna's biological father; it does not require proof of any specified conduct, nor does it limit the type or source of permissible evidence, provided the evidence is clear and convincing.

David's parents contend that David could have held Cheyanna out as his "child," but that he did not do so. Of course, David died before Cheyanna's birth, which raises the question of whether Cheyanna was a "child" before she was born. In that regard, David's parents argue that the term "child," as used in the laws of intestate succession, includes an unborn child or fetus. They emphasize that David lived for six months after he learned that Angela was pregnant and that he never acknowledged paternity. As the trial court noted: "[David] could have offered to care for the child. He could have asked [Angela] to marry him. He could have told his friends and family that

---

[14]These alternatives for proving paternity apply if a child has no "presumed" father or if the "presumed" father is dead. (Prob. Code, § 6453, subds. (a), (b); Fam. Code, § 7630, subd. (c).) The parties agree that Cheyanna must satisfy one of these two alternatives. A third alternative—a court order entered during the father's lifetime declaring paternity—is not applicable. (See Prob. Code, § 6453, subd. (b)(1).)

he was going to be a father. There is no evidence that he did any of these things." Under this line of reasoning, it was possible for David to hold Cheyanna out as his "child." Because he did not do so, Cheyanna would not be an heir. (See Prob. Code, § 6453, subd. (b)(2).)

For her part, Cheyanna argues that the term "child" does not include an unborn child or fetus. She contends that "child" means a human being born alive. Under this definition, it was impossible for David to hold Cheyanna out as his "child" since he died before she was born. Accordingly, Cheyanna would be an heir if she can establish David's paternity through clear and convincing evidence. (See Prob. Code, § 6453, subd. (b)(3).)

At the outset, we note that the laws of intestate succession provide no guidance in determining whether the term "child" includes an unborn child or fetus. The intestacy laws define "child" by using the word "child" and are therefore of no help. (See Prob. Code, § 26.) Further, while the intestacy laws refer to the parent-child relationship of a "person" (*id.*, § 6450, subd. (a)), the word "person" is defined as "an individual, corporation, government or governmental subdivision or agency, business trust, estate, trust, partnership, limited liability company, association, or other entity" (*id.*, § 56). Again, we must look elsewhere.

At first blush, Probate Code section 6407 appears promising. It provides that "[r]elatives of the decedent conceived before the decedent's death but born thereafter inherit as if they had been born in the lifetime of the decedent." Obviously, a decedent's daughter is one of his "relatives." Yet, where the child is illegitimate, section 6407 cannot be applied without first determining whether the child is, in fact, a "relative," i.e., whether the decedent was the child's father. Section 6407 does not indicate how that determination should be made. Thus, as applied in this case, section 6407 tells us that *if* Cheyanna is David's daughter, she is an heir even though she was born after he died. But to determine whether David could hold Cheyanna out as his "child," we must search beyond the intestacy laws.

David's parents direct our attention to Civil Code section 43.1, formerly Civil Code section 29. Before its repeal in 1994, section 29 provided in part: "A child conceived, but not yet born, is to be deemed an existing person, so far as may be necessary for its interests in the event of its subsequent birth . . . ." (6 West's Ann. Civ. Code (1982 ed.) § 29, p. 94 repealed by Stats. 1993, ch. 219, § 2.) Effective January 1, 1994, the relevant part of section 29 was reenacted without substantive change as section 43.1. (See Stats. 1992, ch. 163, §§ 4, 161, pp. 724-725, 842; Stats. 1992, ch. 162, § 13, p. 722; Cal. Law Revision Com. com., 6 West's Ann. Civ. Code (1998 pocket supp.)

§ 43.1, p. 12.) Section 43.1 states: "A child conceived, but not yet born, is deemed an existing person, so far as necessary for the child's interests in the event of the child's subsequent birth." The intestacy laws are to be construed in a manner consistent with section 43.1. (See Cal. Law Revision Com. com., 53 West's Ann. Prob. Code (1991 ed.) § 6407, p. 510.)[15]

In *Justus* v. *Atchison, supra,* 19 Cal.3d 564, the Supreme Court discussed section 43.1 in the context of a wrongful death action. There, a married couple brought a wrongful death action against a physician and a hospital based on the stillbirth of a fetus. The plaintiffs argued that a stillborn fetus is a "person" within the meaning of the wrongful death statute. In rejecting that argument, the court stated:

" '[T]here are major and decisive areas where the embryo and fetus are not treated as equivalent to the born child.' Indeed, such equivalence is the exception rather than the rule. . . . 'In areas other than criminal abortion, the law has been reluctant to endorse any theory that life, as we recognize it, begins before live birth or to accord legal rights to the unborn except in narrowly defined situations and except when the rights are contingent upon live birth. For example, the traditional rule of tort law denied recovery for prenatal injuries even though the child was born alive. That rule has been changed in almost every jurisdiction. . . . Similarly, unborn children have been recognized as acquiring rights or interests by way of inheritance or other devolution of property, and have been represented by guardians *ad litem.* Perfection of the interests involved, again, has generally been contingent upon live birth. In short, the unborn have never been recognized in the law as persons in the whole sense.' . . .

"The law of California on these questions is statutory. Recovery is permitted for prenatal injuries by a child who is born alive, solely because the action falls within the terms of Civil Code section [43.1]. That section provides generally that 'A child conceived, but not yet born, is to be deemed an existing person, so far as . . . necessary for [the child's] interests in the event of [the child's] subsequent birth; . . .' Among the 'interests' of the child under this statute is the right to compensation for personal injuries inflicted by the intentional or negligent conduct of another. . . .

"The property rights of an unborn child are also prescribed in Civil Code section [43.1], together with a number of special statutes on the subject. . . . None of these rights vests, however, unless and until the child is

---

[15]Former Civil Code section 29 and its replacement, Civil Code section 43.1 (section 43.1), are almost identical in wording and are substantively indistinguishable. To avoid confusion, we will refer only to the current statute, section 43.1, not to its predecessor. Consistent with this approach, we have made editorial changes in quoted material so that it, too, refers only to section 43.1.

born alive: that requirement is . . . explicitly stated . . . in Civil Code section [43.1] . . . ." (19 Cal.3d at pp. 577-578, citations and fn. omitted.)

As *Justus* makes clear, section 43.1 confers various rights upon an unborn child—including the rights to inherit, to own property, and to recover for prenatal injuries—provided the child is born alive. (19 Cal.3d at pp. 577-579.) *Justus* also points out that the law typically does not equate a fetus with a born child. (*Id.* at p. 577.) Thus, "when the Legislature speaks generally of a 'person,' as in [the wrongful death statute], it impliedly but plainly excludes . . . fetuses." (*Id.* at p. 579.) Finally, *Justus* teaches that ambiguous terms in the wrongful death statute are to be interpreted so as to promote justice. (*Id.* at pp. 579-580.)

Equally important, the courts have applied section 43.1 outside the wrongful death context in construing statutes that use the term "child." For example, in *Lavell* v. *Adoption Institute* (1960) 185 Cal.App.2d 557 [8 Cal.Rptr. 367], an unmarried couple, Frederick and Mary, were cohabiting when Mary became pregnant. A week before the child was born, Mary left the couple's residence and never returned. Without Frederick's knowledge, Mary gave birth to the child and put it up for adoption. Frederick eventually found the baby and brought suit against the adoption agency to gain custody of the child.

The adoption agency invoked former Civil Code section 200, which allowed the mother of an *illegitimate* child to put it up for adoption without the father's consent. (185 Cal.App.2d at p. 558.) Frederick relied on former Civil Code section 224, which required the consent of both parents to place a *legitimate* child up for adoption. (185 Cal.App.2d at p. 558.) In arguing that the child was legitimate, Frederick cited former Civil Code section 230, which provided: " 'The father of an illegitimate *child*, by publicly acknowledging it as his own, receiving it as such, with the consent of his wife, if he is married, into his family, and otherwise treating it as if it were a legitimate *child*, thereby adopts it as such; and such *child* is thereupon deemed for all purposes legitimate from the time of its birth.' " (185 Cal.App.2d at p. 561, italics added.)[16] The trial court awarded custody to Frederick.

On appeal, the adoption agency phrased the question before the court as, " 'May the legitimation of a child under Civil Code, Section 230 be accomplished prior to its birth?' " (185 Cal.App.2d at p. 560.) To this, the court

---

[16]Civil Code section 230 was enacted in 1872 (see Historical Note, 6 West's Ann. Civ. Code (1982 ed.) § 230, p. 554) and was repealed in 1975 (see Stats. 1975, ch. 1244, § 8, p. 3196). It was replaced by Civil Code section 7004 (see Stats. 1975, ch. 1244, § 11, p. 3197), which was repealed in 1993 (see Stats. 1993, ch. 219, § 63) and replaced by sections 7611, 7611.5, and 7612 of the Family Code (see Cal. Law Revision Com. com., 12B West's Ann. Civ. Code (1997) § 7004, p. 270).

replied, "[O]ur answer must be in the affirmative." (*Ibid.*) In upholding the trial court, the Court of Appeal applied section 43.1 and concluded that an unborn child is a "child" for purposes of former Civil Code section 230. The court explained: "[U]nder section [43.1], the unborn child of unwed parents is an existing person for the purpose of adoption and we believe is as capable of being received into the family of the father, and to be as much a part of the family as an unborn child of married parents. The child must be treated as if it were legitimate, but this requirement may not be construed as applying only to a child after its birth. It is not questioned that [Frederick] provided a home for the child's mother and supported her until their separation, shortly before the birth of the child. Certainly he did not deny parenthood, nor did he in any manner treat it otherwise than as a legitimate child. He has not neglected the child or failed in any duty toward it." (185 Cal.App.2d at p. 561; see also *Estate of Abate* (1958) 166 Cal.App.2d 282 [333 P.2d 200].)

In *Kyne* v. *Kyne* (1940) 38 Cal.App.2d 122 [100 P.2d 806], a mother filed an action for child support on behalf of her illegitimate unborn child. The action was based on former Civil Code section 196a, which provided: " 'The father as well as the mother, of an illegitimate *child* must give him support and education suitable to his circumstances. A civil suit to enforce such obligations may be maintained in behalf of a minor illegitimate *child*, by his mother or guardian . . . .' " (38 Cal.App.2d at p. 126, italics added.)[17] The father argued that the lawsuit was premature because the "child" had not yet been born. The Court of Appeal rejected that argument, stating: "Obviously, a child must be supported both before, as well as after birth. . . . [S]ection [43.1] must be read together with section 196a so as to confer the right on an unborn child through a guardian *ad litem* to compel the right to support . . . ." (38 Cal.App.2d at p. 127.)

Here, David's parents contend that, under section 43.1, the term "child," as used in the phrase "held out the child as his own" (Prob. Code, § 6453, subd. (b)(2)), must be construed to include an unborn child or fetus. If that were so, David could have held Cheyanna out as his "child" before she was born. Since he did not do so, the argument goes, Cheyanna is not an heir, and she has no standing to sue for wrongful death.

We reject this contention because it ignores the purpose of section 43.1. As the statutory language indicates, section 43.1 is applicable "so far as necessary for the child's interests." Put another way, section 43.1 applies to the extent it *benefits* a child.

---

[17]Effective January 1, 1994, former Civil Code section 196a was repealed and was replaced by sections 3900 and 4000 of the Family Code. (See Historical and Statutory Notes, 6 West's Ann. Civ. Code (1998 pocket supp.) § 196a, p. 130.)

In *Scott* v. *McPheeters* (1939) 33 Cal.App.2d 629 [92 P.2d 678], the court was faced with the question of whether a child, once born, can maintain an action for personal injuries sustained *in utero*. In recognizing such a claim, the court discussed the "interests" protected by section 43.1: "There appears to be no language in [section 43.1] which is uncertain or ambiguous. It seems to be as clear and concise as the English language could make it. It says that an unborn child which has been conceived is deemed to be 'an existing person' when that assumption is necessary 'for [the child's] interests', in the event of [the child's] subsequent birth. There appears to be no reason for confining the word 'interests' to the child's right of inheritance or to its property rights. Clearly the word is general in its application and includes both personal and property rights. . . . We assume the word 'interests' is used in section [43.1] in the general sense of anything that is profitable or beneficial to the child. In Black's Law Dictionary, . . . the term is defined as 'a right to have the advantage accruing from anything.' All standard dictionaries include in the definition of the word 'an advantage, profit or benefit' in any property, enterprise or thing. That includes benefits or rights flowing from real or personal property or from choses in action. . . ." (*Scott* v. *McPheeters*, *supra*, 33 Cal.App.2d at pp. 631-632.)[18]

Similarly, in *Kyne* v. *Kyne*, *supra*, 38 Cal.App.2d 122, where the court held that a father has a duty to support his unborn child, the court noted that section 43.1 "comes into operation whenever it is in the interests of the child that it should come into operation. . . . [T]he word 'interests,' appearing in the section means 'anything that is profitable or beneficial to the child.' . . . It is clearly to the best 'interests' of the child that its father be compelled to support it, if the mother cannot, prior to its birth." (38 Cal.App.2d at p. 127.)

A concern for the child's best interests was also at work in *Lavell* v. *Adoption Institute*, *supra*, 185 Cal.App.2d 557. As discussed, in that case, an unmarried couple had a child, which the mother put up for adoption without the father's consent. The father successfully sued the adoption agency for custody of the child. In applying section 43.1, the court said:

"The contention [of the adoption agency] appears to be that it would not be necessary, in the interest of the child, that it be adopted by its father. We do not doubt that it is in the interest of any child to be reared by a married couple. But we believe that the *primary interest and right* of an unborn child of unwed parents is to acquire the status of a legitimate child. We doubt that

---

[18]The *Scott* decision has been frequently cited with approval. (See, e.g., *Justus* v. *Atchison*, *supra*, 19 Cal.3d at pp. 570, 578; *Young* v. *Haines* (1986) 41 Cal.3d 883, 892 [226 Cal.Rptr. 547, 718 P.2d 909]; *Wilson* v. *Kaiser Foundation Hospitals* (1983) 141 Cal.App.3d 891, 896-897 [190 Cal.Rptr. 649].)

it has ever been questioned that the *welfare of a child* of parents who are well qualified to fulfill, and have fulfilled, the obligation of parenthood will be better served by its being reared by its natural parents than by adoptive parents. Adoption by strangers is a beneficent substitute for the custody of natural parents, but it is a measure that is not to be employed when the natural parents are qualified, able and willing to bear their responsibilities.

". . . [W]e are convinced that an unborn child of unwed parents may be adopted by its father. It is deemed an existing person 'as far as may be necessary for its *interests*,' most important of which is the right of legitimation and to have the security of a father's care and support." (185 Cal.App.2d at pp. 560-561, italics added.)

■ As the Ninth Circuit Court of Appeals has stated more recently: "California Civil Code section [43.1] was enacted . . . to create a cause of action for the benefit of the child, and to protect its interests in the event of its subsequent birth. . . . The word 'interests' as used in section [43.1] means anything that is profitable or beneficial to the child, . . . including the right to compensation 'for personal injuries wrongfully inflicted by the willful or negligent acts of another person.'" (*Endo Laboratories, Inc.* v. *Hartford Ins. Group* (9th Cir. 1984) 747 F.2d 1264, 1267.)

In sum, the statutory language and the pertinent case law leave no doubt that section 43.1 was intended to *benefit* a child born out of wedlock. The statute serves to *protect* the interests of the unborn child, not to destroy them. ■ We think it beyond question that Cheyanna has a significant interest in determining the identity of her father. If it turns out that David was her father, Cheyanna would also have an important interest in seeking redress for his allegedly wrongful death.[19]

Cheyanna's interests would hardly be served by applying section 43.1 in construing the intestacy laws, i.e., by defining "child" to include a fetus. Such an application would preclude Cheyanna from obtaining a legal determination of paternity and from maintaining a wrongful death action. Plainly, the operation of the statute would not further Cheyanna's interests, nor would it promote "justice." (*Justus* v. *Atchison, supra,* 19 Cal.3d at p. 579.)

---

[19]In light of the relationship between standing to sue under the wrongful death statute and the right to inherit under the laws of intestate succession, we realize that if Cheyanna has standing to maintain a wrongful death action, she may also have a right of inheritance if David died intestate. This possibility strengthens Cheyanna's interests in obtaining a legal resolution as to David's paternity.

Accordingly, section 43.1 does not apply in resolving the question of David's paternity.[20]

In these circumstances, the term "child," as used in the intestacy laws, means a human being born alive, not an unborn child or fetus. (See *Justus* v. *Atchison, supra,* 19 Cal.3d at p. 579 ["when the Legislature determines to confer legal personality on unborn fetuses for certain limited purposes, it expresses that intent in specific and appropriate terms"]; *People* v. *Ward* (1998) 62 Cal.App.4th 122, 126-128 [72 Cal.Rptr.2d 531] [absent qualifying language, the word "child" excludes an unborn child]; *Reyes* v. *Superior Court* (1977) 75 Cal.App.3d 214 [141 Cal.Rptr. 912] [same].) Because David died before Cheyanna was born, it was impossible for him to hold her out as his "child," i.e., as a born child. Given this impossibility, we find that Cheyanna may establish David's paternity, if at all, through clear and convincing evidence. (See Prob. Code, § 6453, subd. (b)(3).)[21]

Our conclusion is compelled not only by the foregoing statutory analysis but also by the legislative history of the intestacy laws.[22] Before January 1, 1994, the laws of intestate succession did not contain an "impossibility" alternative for proving the paternity of an illegitimate child. Instead, former Probate Code section 6408, subdivision (f)(2), provided that a biological father was a "natural parent" if (1) a court order was entered during the father's lifetime declaring paternity or (2) paternity was established by clear and convincing evidence that the father had openly and notoriously held out the child as his own. (Stats. 1990, ch. 79, § 14, p. 722.)[23]

---

[20]Whether a child's interests are best served by applying section 43.1 is a question that must be decided on the facts of each case. The result here does not suggest that section 43.1 can never apply to the intestacy laws.

[21]Nothing in *People* v. *Sianes* (1933) 134 Cal.App. 355 [25 P.2d 487] is to the contrary. *Sianes* involved a prosecution under Penal Code section 270, which makes it a misdemeanor for a parent to willfully fail to support his or her child. In *Sianes,* the court held that a parent must support an *unborn* child because section 270 states that " '[a] child conceived but not yet born is to be deemed an existing person *insofar as this section is concerned.*' " (134 Cal.App. at p. 356, italics added.) *Sianes* has no bearing on whether section 43.1 applies in the present case. Unlike Penal Code section 270, section 43.1 applies "as far as necessary for the child's interests . . . ." As we have explained, this language requires an assessment in each case as to whether the application of section 43.1 will benefit the child. Here, it would not. Penal Code section 270 does not require or permit such an assessment. (See *Norman* v. *Murphy* (1954) 124 Cal.App.2d 95, 98 [268 P.2d 178]; *People* v. *Ward, supra,* 62 Cal.App.4th at p. 127.)

[22]We can resort to extrinsic aids, such as legislative history, in determining the intent of the Legislature. (*California Mfrs. Assn.* v. *Public Utilities Com.* (1979) 24 Cal.3d 836, 844 [157 Cal.Rptr. 676, 598 P.2d 836]; *Burden* v. *Snowden* (1992) 2 Cal.4th 556, 562 [7 Cal.Rptr.2d 531, 828 P.2d 672].)

[23]These alternative methods of proof applied if the child had no "presumed" father or if the "presumed" father was dead. (See former Prob. Code, § 6408, subd. (f)(1), (2), added by

Effective January 1, 1994, Probate Code section 6408, subdivision (f)(2), was repealed. (Stats. 1993, ch. 529, § 4.) To replace it, the Legislature enacted Probate Code section 6453, which has remained unchanged. (See Cal. Law Revision Com. com., 53 West's Ann. Prob. Code, (1998 pocket supp.) § 6453, p. 183.) Section 6453, unlike its predecessor, includes a third means of proving paternity—by clear and convincing evidence if "[i]t was impossible for the father to hold out the child as his own." (Prob. Code, § 6453, subd. (b)(3).)

The Legislative Counsel's Digest discusses the addition of the "impossibility" provision as follows:

"Under existing law, with certain exceptions, the relationship of parent and child may be established, for the purpose of determining intestate succession, (1) by a court order declaring paternity and entered . . . during the father's lifetime or (2) by clear and convincing evidence that the father openly and notoriously held out the child as his own during the father's lifetime.

"This bill would instead provide that paternity may be established by court order as specified in (1) above, by clear and convincing evidence that the father has openly held out the child as his own, *or* by clear and convincing evidence of paternity if it was not possible for the father to openly hold out the child as his own." (Legis. Counsel's Dig., Assem. Bill No. 1137 (1993-1994 Reg. Sess.) pp. 2-3, italics added.)

A report prepared by the Office of Senate Floor Analyses described the situations in which the "impossibility" provision was meant to apply:

"In a current case in Kern County, the alleged father (unmarried) was in an automobile accident which left him paralyzed. His son was born the same day as the father's accident. The father was in traction until his death 28 days later.

"In another Los Angeles County case, *the alleged father (unmarried) was killed while the mother of the illegitimate child was still pregnant.* Under these facts, if the father did not hold out the child as his own, no court order establishing paternity could have been entered during the father's lifetime. *Current law would bar the child from establishing paternity.*

"This bill would offer another alternative for establishing the parent-child relationship.

---

Stats. 1990, ch. 79, § 14, p. 722; former Civ. Code, § 7006, subd. (c), added by Stats. 1975, ch. 1244, § 11, p. 3198; see also fn. 14, *ante*.)

" . . . . . . . . . . . . . . . . . . . . . . .
.

"According to the author's office, '[s]ection 6408 of the Probate Code as currently written, appears to be unconstitutional when applied to certain cases. In cases where the father did not have an opportunity to openly and notoriously hold out the child as his own, and *there was not enough time to obtain a court order establishing paternity between the time of the child's birth and the father's death*, Probate Code Section 6408 bars the child from establishing paternity.'

" 'In such cases,' states the author, 'Probate Code Section 6408 creates an 'impenetrable barrier' which does not allow an illegitimate [child] to establish paternity. A similar statute which constituted an 'impenetrable barrier' to illegitimate children in establishing paternity was held unconstitutional in Gomez v. Perez (1973) 409 U.S. [535].' " (Sen. Rules Com., Off. of Sen. Floor Analyses, Analysis of Assem. Bill No. 1137 (1993-1994 Reg. Sess.) pp. 2-3, italics added.)[24]

Finally, Assemblyman William Knight, who authored the bill to add the "impossibility" provision, sent a letter to Governor Wilson requesting that he approve the legislation. In part, the letter reads:

"The bill alleviates a problem that was brought to my attention by Dave Bianchi, a Lancaster attorney. He had a case in which a child was not treated fairly due to a deficiency in the law.

"The child's parents were unmarried but living together. *On the day that the child was born the father was [injured] in a diving accident.* He went into a coma and died a few weeks later. Although he had made obvious preparations for the birth of his child, the law holds that he must 'openly and notoriously hold out [that] the child is his own.' Obviously, a person in a coma would not be able to meet this legal threshold.

"[The bill] would allow the existence of a parent-child relationship for the purpose of [intestate] succession [to] be established by clear and convincing evidence when it was impossible for the father to hold out the child as his own and paternity is established by clear and convincing evidence." (Letter

---

[24]In Gomez v. *Perez* (1973) 409 U.S. 535 [93 S.Ct. 872, 35 L.Ed.2d 56], the court noted that "under the Equal Protection Clause of the Fourteenth Amendment a State may not create a right of action in favor of children for the wrongful death of a parent and exclude illegitimate children from the benefit of such a right." (*Id.* at pp. 537-538 [93 S.Ct. at pp. 874-875].) The *Gomez* court held that if a state requires fathers to provide maintenance and support for legitimate children, the same obligation must be imposed with respect to illegitimate children. (*Id.* at p. 538 [93 S.Ct. at p. 875].)

dated Aug. 31, 1993, from Assemblyman William Knight to Governor Pete Wilson, on file with Legislative Intent Service, History of Assem. Bill No. 1137 (1993-1994 Reg. Sess.), prepared Aug. 6, 1998, document No. 9, A-1, italics added.)

In sum, the legislative history indicates that the "impossibility" provision was enacted to cover the situation now before the court—where the father dies before the child is born. It follows that the trial court erred in granting the motion for summary judgment. The motion was premised on the theory that David could have held Cheyanna out as his child but failed to do so. That was the wrong theory. Under the correct analysis, it was impossible for David to hold Cheyanna out as his child. Consequently, Cheyanna is permitted to prove paternity through evidence that is clear and convincing. Under the applicable test, the moving parties are not entitled to judgment as a matter of law. Nor have they established that, under the correct test, the material facts are undisputed. We accordingly reverse the judgment.[25]

## DISPOSITION

The judgment is reversed. Appellant is entitled to costs on appeal.

Ortega, Acting P. J., and Vogel (Miriam A.), J., concurred.

---

[25]We reject the argument that, in opposing summary judgment, Cheyanna should have sought to determine paternity through blood tests. Because the motion was limited to the question of whether David had held Cheyanna out as his child, the results of any blood tests would have been irrelevant.