Filed 4/12/19

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| JACQUELINE STENNETT etc., | |
| Plaintiff and Appellant, | G054989 |
| v. | (Super. Ct. No. 30-2011-00487412) |
| DANAE MARIE MILLER et al., | O P I N I O N |
| Defendants and Respondents. | |

Appeal from a judgment of the Superior Court of Orange County, Timothy J. Gibbs, Temporary Judge. (Pursuant to Cal. Const., art. VI, § 21.) Affirmed.

Ferguson Case Orr Paterson, Wendy C. Lascher for Plaintiff and Appellant.

Horvitz & Levy, Curt Cutting and Emily V. Cuatto; Veatch Carlson, Mark A. Weinstein and Mark M. Rudy for Defendants and Respondents.

\*          \*          \*

This case presents two issues: does the nonmarital biological child of an absentee father who never openly held her out as his own have standing under Code of Civil Procedure section 377.60 (section 377.60) to sue for his wrongful death if she failed to obtain a court order declaring paternity during his lifetime?[1] If she does not have standing, does section 377.60 violate the state or federal equal protection clauses?

We conclude the child does not have standing under the circumstances presented here, and we find no equal protection violation. As explained below, the legislative history of California's wrongful death statute establishes that standing to sue for wrongful death turns on whether the plaintiff has a right to inherit from the decedent under California's intestate succession statutes. In this particular case, the child has no right to inherit from the decedent because he never openly held her out as his own and because she never obtained a court order declaring paternity during his lifetime. It follows that she does not have standing to sue for his wrongful death. Notably, a contrary conclusion would deprive the decedent's parents and siblings of standing to sue for his wrongful death. We cannot imagine the Legislature intended to confer wrongful death standing on a child who had no relationship whatsoever with the decedent to the exclusion of the decedent's other family members with whom he *did* have a relationship.

We also reject the appellant's equal protection argument. California's wrongful death standing rules do not categorically exclude nonmarital children. They confer standing on a variety of children — both marital and nonmarital — if they satisfy certain criteria concerning their relationship with the decedent during his lifetime. This is not a case where the state has created an insurmountable barrier to nonmarital children; to

---

[1] Prior opinions have used the term "illegitimate children." We use the term "nonmarital children" instead because we do not wish to suggest that children born to unmarried parents are in any way inferior to children born to married parents. This opinion uses the term "nonmarital children" in the same sense that prior opinions have used the term "illegitimate children."

the contrary, a nonmarital child has multiple statutory avenues for establishing he or she has a right to inherit from the decedent under California's intestate succession laws and thus has wrongful death standing.

Nor do California's wrongful death standing rules illegally discriminate on the basis of gender. A state may validly impose different requirements for establishing natural parent status for birth mothers and biological fathers because mothers and fathers are not similarly situated when it comes to their role in becoming parents.

We therefore affirm the judgment dismissing the complaint for lack of standing.

## I.

### FACTS[2]

This case arises out of the death of Amine Britel, who was killed by a texting drunk driver at the age of 41. (*Estate of Britel, supra*, 236 Cal.App.4th at p. 134.) Britel never married, and he died intestate. (*Ibid.*) He was survived by his mother and his two adult sisters.

A.S. is Britel's biological child, as confirmed by DNA testing conducted after his death. A.S. was conceived during a brief relationship between Britel and A.S.'s mother, appellant Jacqueline Stennett (Jackie), when they were both graduate students. (*Estate of Britel, supra*, 236 Cal.App.4th at pp. 132-133.) Several months after they parted ways, Jackie informed Britel of her pregnancy. (*Id.* at p. 133.) Britel felt he never could tell his family about having a child out of wedlock, and he told Jackie that he wanted no contact with her or the baby. (*Ibid.*)

Jackie decided she wanted Britel "'to participate when he was ready and by his own choice,'" so she never sought a court order declaring paternity during Britel's

---

[2] We provided a more detailed discussion of the facts in *Estate of Britel* (2015) 236 Cal.App.4th 127 (*Estate of Britel*). We will not restate them in full here, but instead provide only a brief summary for context.

lifetime.  (*Estate of Britel, supra*, 236 Cal.App.4th at p. 134.)  A.S. was 10 years old when Britel died in February 2011.  She never met Britel or had any relationship with him.  (*Ibid.*)  After Britel's death, Jackie filed a petition to have A.S. declared Britel's heir under the Probate Code's intestacy provisions.  (*Estate of Britel, supra*, 236 Cal.App.4th at p. 132.)  Acting as A.S.'s guardian ad litem, Jackie also filed a wrongful death complaint against the driver who killed Britel and the driver's parents (collectively, the Millers), among others.  The wrongful death action was stayed pending the heirship litigation in the probate court.

The probate court held that A.S. did not qualify as Britel's heir, and a different panel of this court affirmed that ruling.  (*Estate of Britel*, *supra*, 236 Cal.App.4th at pp. 132, 134.)  As this court explained, if an intestate decedent has no surviving spouse or domestic partner, as was the case here, the estate passes to the decedent's "issue," that is, his or her lineal descendants *as determined by the statutory definitions of parent and child.*  (*Id.* at pp. 135-136 [citing Prob. Code, §§ 50, 6402].)  These definitions provide that a parent-child relationship exists "'between a person and the person's natural parents, regardless of the marital status of the natural parents.'"  (*Ibid.* [citing Prob. Code, § 6450, subd. (a)].)  Probate Code section 6453 governs "whether a person is a 'natural parent'" and provides, among other things, that a natural parent-child relationship may be "established by clear and convincing evidence that the parent has openly held out the child as his own."  (Prob. Code, § 6453, subd. (b)(2).)

Applying these provisions, this court concluded Britel did not openly hold out A.S. as his own and therefore A.S. did not qualify as his heir under Probate Code section 6453, subdivision (b)(2).  (*Estate of Britel, supra*, 236 Cal.App.4th at pp. 137-140.)  This court also rejected A.S.'s equal protection challenge to subdivision (b)(2), although it refrained from deciding the constitutionality of the wrongful death statute.  (*Id.* at pp. 145-148, fn.12.)

4

After *Estate of Britel* was decided, the Millers moved for judgment on the pleadings against A.S. in the wrongful death action. The trial court granted their motion and dismissed the complaint for lack of standing. It reasoned that standing for wrongful death hinges on whether a plaintiff qualifies as the decedent's heir under California's intestate succession statutes. It also rejected Jackie's equal protection challenge to the wrongful death statute. Jackie appealed.

## II.

### DISCUSSION

A. *Standard of Review*

We review de novo questions of statutory construction and the determination of a statute's constitutionality. (*Lee v. Hanley* (2015) 61 Cal.4th 1225, 1232; *Rental Housing Owners Assn. of Southern Alameda County, Inc. v. City of Hayward* (2011) 200 Cal.App.4th 81, 90.)

B. *A.S. Lacks Standing to Sue for Wrongful Death*

    1.    General Principles Guiding Our Analysis

In California, a wrongful death cause of action "is wholly statutory in origin." (*Steed v. Imperial Airlines* (1974) 12 Cal.3d 115, 119-120 (*Steed*).) As our Supreme Court has explained, "the Legislature intends to occupy the field of recovery for wrongful death." (*Justus v. Atchison* (1977) 19 Cal.3d 564, 575 (*Justus*), disapproved on other grounds in *Ochoa v. Superior Court* (1985) 39 Cal.3d 159, 171.) "Because it is a creature of statute, the cause of action for wrongful death 'exists only so far and in favor of such person as the legislative power may declare.'" (*Ibid.*)

Thus, "'the right to bring such an action is limited to those persons identified'" in the wrongful death statute, section 377.60. (*Scott v. Thompson* (2010) 184 Cal.App.4th 1506, 1510 (*Scott*); see *Steed*, *supra*, 12 Cal.3d at p. 119 ["'It is well settled that the right to bring an action for the wrongful death of a human being is limited to the persons described in [the statute]'"].) The category of persons eligible to bring

5

wrongful death actions is strictly construed.  (*Cheyanna M. v. A.C. Nielsen Co.* (1998) 66 Cal.App.4th 855, 865 (*Cheyanna M.*).)

The wrongful death statute provides in pertinent part:  "A cause of action for the death of a person caused by the wrongful act or neglect of another may be asserted by any of the following persons . . .  [¶] (a) The decedent's surviving spouse, domestic partner, *children*, and issue of deceased children, or, if there is no surviving issue of the decedent, the persons, including the surviving spouse or domestic partner, who would be entitled to the property of the decedent by intestate succession."  (§ 377.60, subd. (a), italics added.)[3]  This appeal turns on the meaning of the word "children" and whether A.S. qualifies as Britel's "child" under section 377.60, subdivision (a).  This is a question of statutory interpretation.

"In determining the meaning of the section, we are guided by the following established principles:  '[O]ur first task in construing a statute is to ascertain the intent of the Legislature so as to effectuate the purpose of the law.  In determining such intent, [we] must look first to the words of the statute themselves, giving to the language its usual, ordinary import . . . .  The words of the statute must be construed in context, keeping in mind the statutory purpose, and statutes or statutory sections relating to the same subject must be harmonized, both internally and with each other, to the extent possible.  [Citations.]  Where uncertainty exists consideration should be given to the consequences that will flow from a particular interpretation.  [Citation.]  Both the legislative history of the statute and the wider historical circumstances of its enactment may be considered in ascertaining the legislative intent.  [Citation.]'"  (*Walnut Creek Manor v. Fair Employment & Housing Com.* (1991) 54 Cal.3d 245, 268.)

"'[I]f the terms of the statute are unambiguous, we presume the lawmakers meant what they said, and the plain meaning of the language governs.'"  (*Scott*, *supra*,

---

[3]    Section 377.60 also confers standing on various other individuals, but those provisions are not at issue here.

6

184 Cal.App.4th at p. 1513.)  However, "[i]f the statutory language is susceptible of more than one reasonable interpretation, we must look to additional canons of statutory construction to determine the Legislature's purpose.  [Citation.]  'Both the legislative history of the statute and the wider historical circumstances of its enactment may be considered in ascertaining the legislative intent.'" (*McCarther v. Pacific Telesis Group* (2010) 48 Cal.4th 104, 110.)  Committee reports and interpretive opinions of the Law Revision Commission are also entitled to great weight in discerning that intent.  (*Hale v. Southern Cal. IPA Medical Group, Inc.* (2001) 86 Cal.App.4th 919, 927.)

2.      The Term "Children" Is Ambiguous

Section 377.60 does not define the term "children."  Jackie interprets "children" to mean the decedent's biological children, whereas the Millers argue the term "children" is ambiguous.

The word "children," by itself, at first blush appears to be unambiguous:  it is commonly understood to refer to one's offspring.  Because we must construe the text as a whole, however, we also must consider the context in which the word "children" is used.  (*K Mart Corp. v. Cartier, Inc.* (1988) 486 U.S. 281, 291 ["In ascertaining the plain meaning of the statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole"].)  Harmonizing the statutory language within the context of the law and its evident purpose is not reliance on an extrinsic source, but merely the best way to learn the meaning of a word.

The statute's overall purpose is to provide standing for specified persons most likely to have suffered damages from the loss of the decedent's companionship or financial support.  (*Lattimore v. Dickey* (2015) 239 Cal.App.4th 959, 968 (*Lattimore*).)  With this in mind, various questions arise concerning the precise meaning of the word "children."  For example, does "children" refer only to biological children?  What about adopted children?  Stepchildren?  Nonadopted stepchildren?  Did the Legislature intend to confer standing to a decedent's biological children who were adopted by another

7

person?  Do the biological children of a decedent have standing if the decedent's parental rights were terminated?  Does the statute confer standing to biological children of an absentee parent or biological children of a sperm or egg donor?  Would adopting Jackie's argument exclude persons with whom the decedent had no biological relationship, but whom the decedent supported financially and emotionally and openly held out as his or her own children?  What about the decedent's "natural child" — i.e., a child with whom the decedent had a parent-child relationship as defined by statute?  Where exactly did the Legislature intend to draw that line?  Answering that question requires more than a reference to how the word "child" is "commonly understood."

It bears noting that our Legislature has not always used the term "child" in a purely biological sense.  The statutory definitions of "natural parent" and the parent-child relationship in Probate Code sections 6450, 6451, and 6453, which govern intestate succession, and Family Code sections 7601, 7611, and 7630, which govern when the rights and obligations of the parent-child relationship arise, illustrate this point.

Indeed, not all biological children necessarily meet the legal definition of "children."  (See, e.g., Prob. Code, § 6451 [adoption severs the relationship of parent and child unless certain requirements are satisfied]; see also Prob. Code, § 6453 [setting forth an exhaustive list of situations when a person is presumed to be a child's natural parent, irrespective of biology]; Fam. Code, § 7611 [same].)

In sum, on closer inspection, it is evident the term "children" in the wrongful death standing statute is indeed susceptible of more than one reasonable interpretation when viewed in context and in light of the wrongful death statute's purpose.  We therefore must turn to the statute's legislative history to determine the Legislature's intent when it provided standing to "children."  (See *Cheyanna M., supra,* 66 Cal.App.4th at p. 863 ["Faced with two different statutory schemes for defining

8

'children,' we examine the legislative history of the wrongful death statute for guidance."].)[4]

3. The Statute's Legislative History Confirms Wrongful Death Standing Remains Linked to Intestacy Laws

As discussed below, the legislative history confirms that when the Legislature used the term "children" in section 377.60, it referred to persons entitled to take from the decedent under California's intestate succession laws.

California's first wrongful death statute was enacted in 1862. (Stats. 1862, ch. 330, §§ 1-4, pp. 447-448.) In 1872, the statute was codified as former section 377 of the Code of Civil Procedure (section 377). (See Historical and Statutory Notes, 14 West's Ann. Code Civ. Proc. (2004 ed.) § 377, p. 104.) At the time of its repeal in 1992, section 377 provided in relevant part: "(a) When the death of a person is caused by the wrongful act or neglect of another, his or her *heirs* . . . may maintain an action for

---

[4] Citing a dictionary definition, our dissenting colleague interprets the word "children" under the wrongful death statute to mean the biological son or daughter of human parents. (Dis. opn., *post*, at p. 6.) Courts must exercise "great caution" when relying on a dictionary definition of a common term to determine statutory meaning because a dictionary "'is a museum of words, an historical catalog rather than a means to decode the work of legislatures.'" (*United States v. Costello* (7th Cir. 2012) 666 F.3d 1040, 1043.) "'[I]t makes no sense to declare a unitary meaning that "the dictionary" assigns to a term. There are a wide variety of dictionaries from which to choose, and all of them usually provide several entries for each word." (*Id.* at p. 1044.) Indeed, Black's Law Dictionary (7th Ed.) includes four different definitions of "child" and over a dozen subentries for related terms, such as "natural child," "foster child," and "nonmarital child." Courts should not simply pick the particular dictionary definition yielding the desired result when interpreting a statute.

The dissent purports to give the statute a "commonsense" reading (dis. opn., *post*, at p. 1.), but ignores the context and purpose of the wrongful death statute as a whole. "The idea that semantically unambiguous sentences—sentences clear 'on their face'—sentences whose meaning is 'plain'—can be interpreted without reference to purpose inferred from context is fallacious. Take that clearest of directives: 'Keep off the grass.' Read literally it forbids the groundskeeper to mow the grass. No one would read it literally." (*Marozsan v. United States* (7th Cir. 1988) 852 F.2d 1469, 1482 (conc. opn. of Posner, J.).)

9

damages against the person causing the death. . . . [¶] (b) For the purposes of subdivision (a), 'heirs' means only the following:  [¶]  (1) *Those persons who would be entitled to succeed to the property of the decedent* according to the provisions of Part 2 (commencing with Section 6400) of Division 6 of the Probate Code…" (i.e., the intestacy laws).  (Stats. 1983, ch. 842, § 12, pp. 3022-3023, italics added, repealed by Stats. 1992, ch. 178, § 19, p. 890; see Historical and Statutory Notes, 14 West's Ann. Code Civ. Proc., supra, § 377, at p. 104.)

Former section 377's use of the word "heirs" prompted disputes over whether a decedent's child could sue for wrongful death even if the decedent's entire estate passed to the surviving spouse under community property laws.  Courts faced with this question found that the word "heirs," as used in former section 377, "denotes those who are *capable of inheriting* from the deceased person generally."  (*Redfield v. Oakland C. S. Ry. Co.* (1895) 110 Cal. 277, 289-290 [fact that decedent's sole "heir" was her surviving spouse per community property laws did not preclude her two minor children from recovering in a wrongful death action]; *Fiske v. Wilkie* (1945) 67 Cal.App.2d 440, 444 [fact that decedent's husband was alive at the time of her death and did not die until several months later did not bar decedent's daughters from suing for wrongful death].)

In other words, the term "'heirs'" in former section 377 was "construed in accordance with the laws of succession" as referring to "that narrow class of persons who would have been eligible to *succeed* to a decedent's estate had he died intestate."  (*Steed*, *supra*, 12 Cal.3d at pp. 119, 123.)  Thus, persons with standing under former section 377 included the decedent's "'issue,'" the decedent's "adopted children," any "illegitimate children from their mother," and nonmarital children "from their father if acknowledged by him."  (*Id.* at p. 119 [decedent's stepchild, whom he never formally adopted, could not sue for wrongful death because he had no ability to inherit from decedent under laws of succession].)

10

Because of these cases, the California Law Revision Commission recommended the Legislature change "heirs" to "children," noting it was unclear whether former section 377 precluded "the decedent's issue . . . from joining in the [wrongful death] lawsuit if the decedent leaves a surviving spouse." (Annual Report for 1992, Appendix 5, Tentative Recommendation, *Standing To Sue for Wrongful Death*, 22 Cal. Law Revision Com. Rep. (1992) p. 959.) The Law Revision Commission explained that the "statute has been broadly construed to permit suit by those who would be intestate takers regardless of the character of the decedent's property, i.e., both the surviving spouse and [the] issue" (citing *Fiske v. Wilkie, supra,* 67 Cal.App.2d 440) and noted that "[t]he wrongful death statute would be clearer, and would conform to case law, if revised to codify this rule." (*Id*. at pp. 959-960.)

Following that recommendation, in 1992 the Legislature repealed section 377 and enacted the present wrongful death statute, codified as sections 377.60 to 377.62 of the Code of Civil Procedure. (Stats. 1992, ch. 178, §§ 19-20, pp. 890, 893-894; Cal. Law Revision Com. com., 14 West's Ann. Code Civ. Proc. § 377, p. 104.) The Legislature has further amended section 377.60 since then, although none of those more recent amendments impact this appeal. As currently drafted, section 377.60 grants standing not to the decedent's "*heirs*" (the language used in former section 377), but rather to the decedent's "surviving spouse, domestic partner, *children*, and issue of deceased children, or, if there is no surviving issue of the decedent, the persons, including the surviving spouse or domestic partner, who would be entitled to the property of the decedent by intestate succession." (Italics added.)

According to the Law Revision Commission Comments, the change from "heirs" to "children" "makes clear that, even if the decedent's estate is entirely community property, the decedent's children and issue of deceased children are proper parties plaintiff, along with the decedent's surviving spouse. This codifies *Fiske v.*

11

*Wilkie*, 67 Cal.App.2d 440, 444. . . ." (Cal. Law Revision Com. com., Deering's Ann. Code Civ. Proc., § 377.60, pp. 164-165.)

As this court previously noted, "[t]he change in the language was not a broadening of the statute, but a mere clarification." (*Phraner v. Cote Mart, Inc.* (1997) 55 Cal.App.4th 166, 170 (*Phraner*).) The change "was intended to allow the children of a decedent to maintain an action for the wrongful death of a parent even though the parent's entire estate was community property bequeathed to the surviving spouse. Essentially, those children who are not heirs only because the estate consists entirely of community property may now assert a claim." (*Ibid.*)

Consequently, notwithstanding the differences between section 377.60 and its predecessor, appellate courts interpreting the current version of section 377.60, subdivision (a), repeatedly have found that "standing to bring a wrongful death action remains linked to the intestacy laws." (*Cheyanna M., supra*, 66 Cal.App.4th at p. 865.) As such, a plaintiff's "standing to bring a wrongful death action must be determined in accordance with the laws of intestate succession." (*Id.* at p. 861; see *Phraner*, 55 Cal.App.4th at p. 170 [discussing legislative history and observing "the statutory right to bring a wrongful death action under section 377.60, subdivision (a) is grounded in the right to inherit from the decedent"].)

Notably, *Cheyanna M.* and *Phraner* were decided over 20 years ago. During that period the Legislature has amended *other* subdivisions of section 377.60, but declined to revisit subdivision (a), the subdivision at issue here. It therefore ""'"must be presumed that the Legislature [was] aware of the judicial construction [of section 377.60] and approve[d] of it."'"" (*People v. Meloney* (2003) 30 Cal.4th 1145, 1161.)

Thus, whether A.S. has standing to sue for Britel's wrongful death turns on whether she has a right to inherit from him. This court previously held in *Estate of Britel* that A.S. has no right to inherit from Britel under California's intestate succession statutes because Britel never "'openly held out [A.S.] as his own'" within the meaning of

12

Probate Code section 6453, subdivision (b)(2). (*Estate of Britel, supra,* 236 Cal.App. at pp. 135-140.) Jackie does not challenge that holding here or otherwise argue A.S. has a right to inherit from Britel under other statutory grounds.

Because A.S. has no right to inherit from Britel under California's intestacy statutes, it follows that she does not have standing under section 377.60 to pursue a wrongful death action for his death. Simply put, the fact that Britel is her biological father, without more, is not enough to create wrongful death standing. (See *Phraner, supra,* 55 Cal.App.4th at pp. 168-171.) Thus, A.S., "'"like any number of other persons who, in particular cases, may suffer . . . personal loss by the death of an individual, is without legal recourse absent specific statutory remedy."'" (*Id.* at p. 170.)

Of course, that is not to say that nonmarital children with absentee fathers never have standing to sue for a parent's wrongful death. Quite the contrary. A nonmarital child can establish he or she is entitled to take from the decedent under California's intestate succession laws — and thus establish standing to sue for his or her biological father's wrongful death — in a number of different ways: (1) by showing the father openly held out the child as his own (§ 377.60, subd. (a); Prob. Code, § 6453, subd. (b)(2)); (2) by showing it was impossible for the father to hold out the child as his own during his lifetime (e.g., if the father died before the child was born) and establishing paternity by clear and convincing evidence (§ 377.60, subd. (a); Prob. Code, § 6453, subd. (b)(3); *Cheyanna M., supra,* 66 Cal.App.4th at p. 877); (3) by showing the child resided with the father for at least 180 days immediately before his death and was dependent on the father for at least half of his or her support (§ 377.60, subd. (c)); or (4) by producing a court order entered during the father's lifetime declaring paternity (§ 377.60, subd. (a); Prob. Code, § 6453, subd. (b)(1)).

Our holding would be different if Jackie had obtained a court order declaring paternity during Britel's lifetime. But Jackie knowingly elected not to obtain a paternity declaration in the 10 years after A.S. was born. Had Jackie done so, A.S.

13

certainly would have standing to sue for Britel's wrongful death. (§ 377.60, subd. (a); Prob. Code, § 6453, subd. (b)(1).) A.S. also would have standing if Britel had died before A.S. was born, and if A.S. established paternity by clear and convincing evidence. (Prob. Code, § 6453, subd. (b)(3).) And she would have standing if Britel had held A.S. out as his own. (Prob. Code, § 6453, subd. (b)(2).) None of those statutory prerequisites occurred here, however. Jackie's decision not to pursue a paternity declaration "carried the risk that [Britel] could die . . . while she waited for him to grow into fatherhood." (*Estate of Britel*, *supra*, 236 Cal.App.4th at p. 144.)[5]

"The decision of the legislature as to how far it will extend the right to maintain a wrongful death action is conclusive." (*Marks v. Lyerla* (1991) 1 Cal.App.4th 556, 561.) Our Supreme Court has declared, "the limitation on those who may bring the action is one which is imposed by the Legislature and, absent a constitutional basis for departure from a clear expression of legislative intent, we are bound thereby." (*Steed, supra,* 12 Cal.3d at p. 120.) "This is not to say that in all instances persons who are not in the class may not suffer equal or greater losses than some who are within the class, but the Legislature is not compelled to anticipate and provide for such persons." (*Id.* at p. 124.)

There is a good reason for this. In crafting standing rules for wrongful death actions, the Legislature can engage committees to review proposed legislation, hold hearings to investigate the policy implications of the contemplated legislation, hear from

---

[5] We are sympathetic to A.S.'s plight. Nevertheless, we must leave to the Legislature the question of whether to expand the relatively short list of persons who have wrongful death standing to include the nonmarital biological child of an absentee father who never openly held her out as his own and against whom the child never obtained a declaration of paternity. To be sure, advances in science require continual adjustments in and reconsiderations of legal standards, and DNA testing has necessitated many re-evaluations and amendments to the law. That said, we are convinced our opinion represents the current state of the law, and we believe the complexity of any adaptation makes it more amenable to the legislative process than the judicial one.

interested parties, debate various proposals, forge compromises, and entertain recommendations from the Law Revision Commission. We can do none of this. Adopting Jackie's position would unravel that democratic process, especially where, as here, the Legislature has implicitly declined to adopt the position now urged upon us by appellant. "In the exercise of a judicial function, we should not assume the prerogative of making changes in a statute when the Legislature, by strong implication, has elected not to do so." (*Steed, supra,* 12 Cal.3d at p. 121.)

Jackie argues A.S. should have standing because she lost the *potential* for enjoying Britel's companionship and support in the future. This is a policy argument that the Legislature presumably has weighed and rejected. The argument furnishes no basis for standing because it is based on mere speculation. (See *Corder v. Corder* (2007) 41 Cal.4th 644, 661 [damages available for wrongful death include """"the financial benefits the heirs were receiving *at the time of death* [and] those *reasonably* to be expected in the future"""] (italics added).) The mere possibility A.S. might have one day qualified as Britel's "heir" had she sought a paternity decree or had Britel decided to hold her out as his own is not enough to confer wrongful death standing. (See *Garcia v. Douglas Aircraft Co*. (1982) 133 Cal.App.3d 890, 893 [decedent's fiancée, who was engaged to marry decedent eight days after his death and who had cohabited with him, lacked standing to bring wrongful death action].)

4.      A Contrary Holding Would Wreak Havoc on the Legislative Scheme

Adopting Jackie's argument that A.S. is entitled to standing based solely on a purely biological tie to the decedent would wreak havoc on the carefully crafted scheme the Legislature has adopted. The Legislature limited wrongful death standing to the persons entitled to take from the decedent under California's intestate succession laws. Those persons, "as a class, stand in the closest relationship to a deceased" and often "suffer the greatest loss upon [the deceased's] wrongful death." (See *Steed, supra*, 12

15

Cal.3d at p. 124.)  Biological children who had no relationship whatsoever with the decedent during his lifetime do not fall within that class.

Under Jackie's interpretation of the statute, a decedent's biological child would have standing even if a court had terminated the decedent's parental rights or even if the child had been adopted by another.  That would directly conflict with existing precedent from this court.  (See *Phraner, supra*, 55 Cal.App.4th at pp. 168-171 [adopted child had no standing to sue for death of her biological mother, notwithstanding genetic relationship, because adoption legally severed the parent-child relationship for intestate succession].)

Granting A.S. standing also would be patently unfair because it would categorically deprive Britel's mother and siblings of standing to sue for his wrongful death.  Section 377.60 confers standing to "[t]he decedent's surviving spouse, domestic partner, children, and issue of deceased children, *or*, *if there is no surviving issue of the decedent*, the persons, including the surviving spouse or domestic partner, who would be entitled to the property of the decedent by intestate succession."  (Italics added.)  Thus, a decedent's parents and siblings do not have standing to sue for wrongful death *unless* the decedent leaves behind no "children."  (*Ibid.*; see *Chavez v. Carpenter* (2001) 91 Cal.App.4th 1433, 1440 ["where a decedent leaves issue, 'his parents would not be his heirs at all [citations] and therefore [are] not entitled to maintain this [wrongful death] action at all'"]; see also *Scott, supra*, 184 Cal.App.4th at p. 1511 [wrongful death "'"standing" among multiple claimants is determined by statutory rank'"].)  We cannot imagine the Legislature intended that A.S. — who had no relationship whatsoever with Britel — would have standing to sue for his wrongful death *to the exclusion of* Britel's other family members, with whom he *did* have a relationship.  Yet that is precisely the result Jackie requested in the trial court, where she claimed A.S. "'*outrank[ed]*'" Britel's

16

other family members and was "the *only* person permitted under California law to pursue wrongful death claims."  (Italics added.)[6]

The dissent suggests granting standing to A.S. would be of minimal consequence because she still "would ultimately have to prove damages."  (Dis. opn., *post*, at p. 5.)  But granting standing to A.S. also would cut off the ability of Britel's mother and siblings to sue for his wrongful death.  The notion that a person who almost certainly suffered no cognizable damages from the decedent's death could, simply by filing suit, prevent persons who likely *did* suffer such damages from ever having their day in court, is wholly incongruous and contrary to the legislative purpose of section 377.60.

In closing, "the cause of action for wrongful death 'exists only so far and in favor of such person as the legislative power may declare'" (*Justus*, *supra*, 19 Cal.3d at p. 575), and we must interpret a statute in a manner that "'effectuate[s] [its] purpose.'" (*Union Bank of California v. Superior Court* (2004) 115 Cal.App.4th 484, 488.)  The logical extension of Jackie's argument in favor of standing — that a purely biological tie to the decedent, without more, is enough — would frustrate the Legislature's decision to limit standing to persons entitled to take from the decedent under California's intestate succession laws, and would "expand the category of people able to recover for the loss beyond that which was contemplated by the Legislature in drafting the statute.  We decline to do so."  (*Phraner*, *supra,* 55 Cal.App.4th at p. 170.)

---

[6]     To further illustrate the unforeseen and presumably unintended consequences of this interpretation, suppose the biological child of an absentee father had her own child and then died.  Under Jackie's reading of the statute, that child — the absentee father's grandchild — would have standing to sue for his wrongful death to the exclusion of the decedent's parents and siblings, despite having nothing more than a genetic tie to the decedent.  That cannot possibly be what the Legislature intended.

17

C.  *Jackie's Equal Protection Challenges Fail*

Jackie next argues that the wrongful death standing statute, as interpreted here, violates the equal protection clauses of the state and federal Constitutions by discriminating on the basis of illegitimacy and gender.  We disagree.

"'The concept of equal protection recognizes that persons who are similarly situated with respect to a law's legitimate purposes must be treated equally.  [Citation.]  Accordingly, "'[t]he first prerequisite to a meritorious claim under the equal protection clause is a showing that the state has adopted a classification that affects two or more similarly situated groups in an unequal manner.'"  [Citation.]  "This initial inquiry is not whether persons are similarly situated for all purposes, but 'whether they are similarly situated for purposes of the law challenged.'"  [Citation.]'"  (*People v. Valencia* (2017) 3 Cal.5th 347, 376 (*Valencia*).)

As to this first step, we conclude the standing rules do not distinguish between marital and nonmarital children; at most they draw a distinction between nonmarital children whose parents took the steps necessary to establish a parent-child relationship during the father's lifetime and children whose parents did not.  The creation of a parent-child relationship makes it likely the child suffered emotional or financial harm from the decedent's death.  Providing standing where no parent-child relationship exists would frustrate the statutory purpose of compensating those most likely to have suffered harm.  These two categories of persons therefore are not similarly situated when considering the purpose of the wrongful death standing rules.

"The second step [of the equal protection analysis] is determining whether there is a sufficient justification for the unequal treatment.  The level of justification needed is based on the right implicated."  (*People v. Flint* (2018) 22 Cal.App.5th 983, 990.)  Intermediate scrutiny applies to discriminatory classifications based on illegitimacy and gender.  (*Clark v. Jeter* (1988) 486 U.S. 456, 461 (*Clark*); *Estate of Britel*, *supra*, 236 Cal.App.4th at p. 145 [explaining why strict scrutiny does not apply to

18

illegitimacy classifications].) "'To withstand intermediate scrutiny, a statutory classification must be *substantially related* to an important governmental objective.'" (*Estate of Britel, supra*, 236 Cal.App.4th at p. 145.) Here, that objective is limiting wrongful death standing to those persons most likely to have had a relationship with the decedent.

      1.      Illegitimacy

            *a.*      *The Wrongful Death Standing Rules Do Not Exclude Nonmarital Children*

California's wrongful death standing rules do not categorically exclude nonmarital children. They confer standing on a variety of children — both marital and nonmarital — if certain criteria pertaining to their relationship with the decedent are met. Specifically, wrongful death standing exists if: a natural parent-child relationship (and thus heirship status) can be established (§ 377.60, subd. (a); Prob. Code, § 6453); a real or putative stepparent-stepchild relationship plus financial dependence can be established (§ 377.60, subd. (b)); or a longstanding, financially dependent relationship can be established (§ 377.60, subd. (c)).

As for the first option, a natural parent-child relationship can be established under the Probate Code "regardless of the parents' marital status. [Citation.] That is, the distinction between legitimate and illegitimate children has been eliminated." (*Lozano v. Scalier* (1996) 51 Cal.App.4th 843, 846 (*Lozano*); see Prob. Code, § 6450, subd. (a) ["The relationship of parent and child exists between a person and the person's natural parents, regardless of the marital status of the natural parents"].) As already noted, Probate Code section 6453 provides a variety of methods to establish a natural parent-child relationship, none of which hinges exclusively on the parents' marital status. For example, if the decedent openly held out the child as his own, that alone would be sufficient to create standing. (Prob. Code, § 6453, subd. (b)(2).)

19

To be sure, if this case involved a "classification[ ] that burden[ed] illegitimate children for the sake of punishing the illicit relations of their parents," we would reach a different result "because 'visiting this condemnation on the head of an infant is illogical and unjust.'" (*Clark, supra*, 486 U.S. at p. 461.) But this is not such a case. As explained above, a nonmarital child has multiple ways of establishing heirship, and thus wrongful death standing. "There is in California no 'insurmountable barrier' to the right of a legitimate or an illegitimate child to succeed to the estate of its natural parent [or] to bring an action for the wrongful death of such parent." (*Steed, supra*, 12 Cal.3d at p. 125.)

In support of her equal protection challenge, Jackie relies on United States Supreme Court decisions mandating equal legal treatment of marital and nonmarital children in a broad range of substantive areas. However, these cases involved laws that denied rights to a *dependent* child based *solely* on his or her parents' marital status, and are thus inapposite. (See *Gomez v. Perez* (1973) 409 U.S. 535, 538 [Texas law that allowed only marital children to obtain financial support from fathers was "invidious" discrimination]; *Weber v. Aetna Casualty & Surety Co.* (1972) 406 U.S. 164, 165, 170 [Louisiana could not treat employee's dependent unacknowledged nonmarital children differently than his marital children or acknowledged nonmarital children for workers' compensation benefits]; *Levy v. Louisiana* (1968) 391 U.S. 68, 72 [Louisiana could not prevent dependent children from suing for their mother's wrongful death merely because they were born out of wedlock; children were dependent on mother and "in her death . . . suffered wrong in the sense that any dependent would"]; see also *Arizmendi v. System*

*Leasing Corp.* (1971) 15 Cal.App.3d 730, 737 (*Arizmendi*)[7] [children cannot be prohibited from suing for biological father's wrongful death solely on the basis they are nonmarital].)

Unlike those cases, the existing statutory framework does not create an insurmountable barrier to nonmarital children based on their parents' marital status, nor does it deprive nonmarital children of a fundamental right, as Jackie suggests. At most, it draws a distinction between nonmarital children whose parents took the steps necessary to establish a parent-child relationship during the father's lifetime and children whose parents did not. That is not a suspect classification, particularly when viewed in the context of the purpose of the wrongful death standing rules. (See *Valencia*, *supra*, 3 Cal.5th at p. 376.)

> **b.      *The Wrongful Death Standing Rules Are Substantially Related to Important Governmental Objectives***

Even if this case involved a suspect classification (which it does not), the statutory framework at issue is substantially related to the statute's ultimate purpose: conferring wrongful death standing on specified persons whom our Legislature deems most likely to have suffered damages from the loss of the decedent's companionship or financial support. (See *Lattimore, supra,* 239 Cal.App.4th at p. 968 ["purpose is to compensate specified persons — heirs — for the loss of companionship and for other losses suffered as a result of a decedent's death"]; *Quiroz v. Seventh Ave. Center* (2006)

---

[7]     At the time *Arizmendi* was decided, former Probate Code section 255 prevented nonmarital children from inheriting from their father *unless* they were either legitimated (by subsequent marriage of their parents or by reception into their father's home) (former Civ. Code, §§ 215, 230) or acknowledged "in writing, signed in the presence of a competent witness." In 1975, as part of a major overhaul recommended by the Law Revision Commission, former section 255 was repealed, and the Uniform Parentage Act was adopted, abolishing the distinction between marital and nonmarital children. (*Lozano, supra*, 51 Cal.App.4th at p. 847.) Under this new scheme, even if paternity is not presumed, a nonmarital child with an absentee father may nevertheless establish heirship status by obtaining a judicial decree of paternity, as noted above. (*Ibid.*)

21

140 Cal.App.4th 1256, 1263 [statute "'limits the right of recovery to a class of persons who, because of their relation to the deceased, are presumed to be injured by his [or her] death'"]; see also *Steed, supra*, 12 Cal.3d at p. 124 ["the class of those who suffer the greatest loss upon a wrongful death are the heirs of the deceased"].) Wrongful death standing bears a close tie to the presumed existence of some sort of supportive relationship with the decedent — emotional or financial — during his lifetime, and the statute aims to compensate those persons for the loss of support. The fact that a different subdivision of the wrongful death statute, subdivision (c), confers wrongful death standing on *any* minor who (a) resided with the decedent in his household for 180 days before his death and (b) was dependent on the decedent for at least one-half of his or her support, illustrates this point. (§ 377.60, subd. (c).)

Requiring the existence or establishment of a parent-child relationship during the decedent's lifetime is consistent with that statutory purpose. Unlike marital or nonmarital children who were dependent on or had some sort of relationship with their father, nonmarital children who never knew and were never supported by their absentee father — whose *sole* tie to their father was genetic — are unlikely to suffer any compensable loss of companionship or financial support in the event of his death. They are thus precluded from suing unless they obtained a court order of paternity during the father's lifetime. (Prob. Code, § 6453, subd. (b)(1).)

As one court observed, "[t]he state has a legitimate interest in preferring" "a man who has undertaken the obligations of marriage and family [over] a man whose only connection with the child is biological." (*Rodney F. v. Karen M.* (1998) 61 Cal.App.4th 233, 239 [holding statutory presumption of husband's paternity does not violate biological father's equal protection rights].) So, too, does the state have a legitimate interest in limiting wrongful death standing to marital and nonmarital children who likely had a relationship with their father.

22

Apparently taking issue with the statutory requirement that Jackie obtain a paternity order "*during* the parent's lifetime" (Prob. Code, § 6453, subd. (b)(1), italics added), Jackie suggests our holding unfairly penalizes A.S. for her mother's inaction. But our laws routinely put the onus on the parent or guardian to assert rights for or otherwise act on behalf of a minor child in a variety of contexts, and "there is a presumption that fit parents act in the best interests of their children." (*Troxel v. Granville* (2000) 530 U.S. 57, 68.) Here, Jackie *knowingly* decided not to pursue a paternity declaration, despite having 10 years to do so before Britel died, and she acknowledged her decision not to try to force Britel to accept parentage meant losing financial support for her child. We must assume she acted in A.S.'s best interests.

Further, the statutory requirement that the paternity order be "entered *during* the [parent's] lifetime" has survived earlier equal protection challenges. (*Estate of Sanders* (1992) 2 Cal.App.4th 462, 475-477, italics added (*Sanders*) [court was "fully cognizant" of former Probate Code § 6408, subd. (c)(2)'s "harsh effect on children born out of wedlock," but nevertheless found no equal protection violation].) In upholding the statute's constitutionality, the *Sanders* court relied largely on *Lalli v. Lalli* (1978) 439 U.S. 259 (*Lalli*).

*Lalli* involved a constitutional challenge to a New York statute that allowed a nonmarital child to inherit from an intestate father only if a court had issued a paternity decree during the father's lifetime. (*Lalli, supra,* 439 U.S. at pp. 261-262.) A divided Supreme Court held the statute was "substantially related to the important state interests the statute is intended to promote" and therefore found no violation of the equal protection clause. (*Id.* at pp. 275-276 (plur. opn. of Powell, J.).) Justice Powell's plurality opinion observed that the statute was intended "to ensure the accurate resolution of claims of paternity . . . [,] to minimize the potential for disruption of estate administration," and to permit a man to defend his reputation against unjust paternity claims. (*Id.* at p. 271.) The plurality held the statute did not violate equal

23

protection because it bore a substantial relationship to those purposes: "The administration of an estate will be facilitated, and the possibility of delay and uncertainty minimized, where the entitlement of an illegitimate child to notice and participation is a matter of judicial record before the administration commences." (*Ibid.*)

Although *Lalli* dealt with intestate succession laws, the analytical framework for evaluating equal protection violations applies here with equal force. *Lalli* observed "few statutory classifications are entirely free from the criticism that they sometimes produce inequitable results." (*Lalli*, *supra*, 439 U.S. at p. 273.) But the Court explained, "[o]ur inquiry under the Equal Protection Clause does not focus on the abstract 'fairness' of a state law, but on whether the statute's relation to the state interests it is intended to promote is so tenuous that it lacks the rationality contemplated by the Fourteenth Amendment." (*Ibid.*)

Here, the requirement that a paternity order be entered during the decedent's lifetime is substantially related to the important governmental objective of limiting wrongful death standing to those persons most likely to have had a supportive relationship with the decedent. In its most basic sense, wrongful death standing for a nonmarital child hinges on establishing that he or she had some sort of supportive relationship (emotional or financial) with his or her biological father *during his lifetime*, or alternatively obtained a paternity decree *during his lifetime*. "'A paternity decree, while not necessarily ordering support, would almost as strongly suggest support was subsequently obtained'" (*Mathews v. Lucas* (1976) 427 U.S. 495, 514 (*Mathews*)) and thus supports an inference that a relationship was formed during the father's lifetime.

In short, even if the wrongful death standing rules created classifications based on illegitimacy (which they do not), we would find no equal protection violation. The statute's limitations on wrongful death standing are substantially related to the important governmental objective of limiting recovery to those individuals most likely to have suffered losses from the decedent's death. (See *Steed, supra*, 12 Cal.3d at p. 124

24

[concluding former section 377 was "reasonably drawn to limit recovery to those intestate heirs who suffer loss by the fact of a wrongful death"]; see also *Mathews, supra,* 427 U.S. at p. 513 [classifications conditioning eligibility of certain nonmarital children for a surviving child's insurance benefits upon a showing of paternity and support are permissible because they are reasonably related to the likelihood of dependency at death].)

2.      Gender

Jackie alternatively argues that section 377.60, as interpreted here, discriminates on the basis of gender in that it creates more hurdles for a nonmarital child suing for the wrongful death of a father than for the wrongful death of a mother. While an unmarried birth mother typically qualifies as the child's natural parent at birth, an unmarried father does not necessarily qualify as the child's natural parent unless additional circumstances are present, such as a declaration of paternity or evidence the father openly held out the child as his own. Jackie concludes the different requirements for becoming a natural parent violate equal protection.[8] To prevail, Jackie must show mothers and fathers are similarly situated in establishing the requisite relationship that nonmarital children must show for standing. This she cannot do.

It is not impermissibly discriminatory to have different requirements for establishing natural parent status for birth mothers and biological fathers because mothers and fathers are not similarly situated when it comes to their role in becoming parents. The mother carries the baby to term and gives birth; the father does not. Only a mother's parental relationship is established at birth. As such, "[f]athers and mothers are not similarly situated with regard to the proof of biological parenthood. The imposition of a different set of rules for making that legal determination with respect to mothers and

---

[8]     The logical extension of Jackie's argument is that the various statutes governing how a nonbirth mother establishes natural parent status are also unconstitutional. (See, e.g., Prob. Code, § 6453; Fam. Code, §§ 7611, 7630.)

fathers is neither surprising nor troublesome from a constitutional perspective." (*Nguyen v. INS.* (2001) 533 U.S. 53, 63; see *Sessions v. Morales-Santana* (2017) 137 S.Ct. 1678, 1694 ["imposing a paternal-acknowledgment requirement on fathers [is] a justifiable, easily met means of ensuring the existence of a biological parent-child relationship, which the mother establishes by giving birth"]; *Lehr v. Robertson* (1983) 463 U.S. 248, 267-268 ["If one parent has an established custodial relationship with the child and the other parent has either abandoned or never established a relationship, the Equal Protection Clause does not prevent a state from according the two parents different legal rights"].)

In sum, we find no merit to Jackie's equal protection challenges. The equal protection "'doctrine is not intended "to make it necessary that the legislature, when conferring new rights of action upon particular classes of citizens for injuries not previously actionable, should by the same act declare that all persons who may suffer damages from injuries of that character shall also have such right of action."'" (*Phraner, supra*, 55 Cal.App.4th at p. 170.)

## III.

### DISPOSITION

The judgment is affirmed. The Millers shall recover their costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1).)

ARONSON, J.

I CONCUR:

BEDSWORTH, ACTING P. J.

26

Moore, J., Dissenting.

I respectfully dissent. Due to modern DNA testing, a nonmarital child can easily establish whether he or she is a "child" of a decedent (even after the parent's death). But under the majority's interpretation of the wrongful death statute, a nonmarital child must overcome burdens to establish standing that are not required of other children. The nonmarital child must rely on the father to declare parentage during his lifetime, or rely on the mother to fortuitously file a paternity action before the father's death. These burdens are not substantially related to an important government purpose, given the ready access and reliability of modern DNA testing. Thus, I would hold that the wrongful death statute, as it is being applied here, violates the equal protection clause.

I would find that under these circumstances the plain meaning of the word "children" in the wrongful death statute should control. There is a conclusive DNA test that proves the decedent Amine Britel was the father of A.S. In this case it is not necessary to rely on intestacy laws in order to interpret the wrongful death statute. (See *Estate of Cleveland* (1993) 17 Cal.App.4th 1700, 1705-1706 [the purpose of intestacy laws is to correctly determine intestate succession].) Thus, I would hold that A.S. has standing to sue for her father's wrongful death.

*Equal Protection*

Persons may not be denied equal protection of the laws under both the state and federal Constitutions. (Cal. Const., art. I, § 7 ["A person may not be . . . denied equal protection of the laws"]; U.S. Const., 14th Amend. ["No State shall . . . deny to any person within its jurisdiction the equal protection of the laws"].) Because the two constitutional provisions guarantee substantially similar rights, courts generally evaluate equal protection claims under the same analytical framework. (*Garcia v. Four Points Sheraton LAX* (2010) 188 Cal.App.4th 364, 382.)

1

When challenged under the equal protection clause, laws are subject to one of three levels of "scrutiny": strict scrutiny, intermediate scrutiny, or rational basis review. Strict scrutiny applies when a law discriminates against a suspect class, such as a racial group, or interferes with fundamental rights. (See, e.g., *Grutter v. Bollinger* (2003) 539 U.S. 306, 326.) Intermediate scrutiny applies when a law discriminates against other suspect classes, specifically nonmarital children and women (or men). (See *Clark v. Jeter* (1988) 486 U.S. 456, 461 (*Clark*).) Rational basis review applies in all other cases. (*Fitzgerald v. Racing Association* (2003) 539 U.S. 103, 106-107.)

In order to withstand strict scrutiny, the government must prove that the law is necessary to achieve a compelling government purpose. (*Palmore v. Sidoti* (1984) 466 U.S. 429, 432-433.) Under intermediate scrutiny, the government must prove that the law is substantially related to an important government purpose. (*Craig v. Boren* (1976) 429 U.S. 190, 218.) Under rational basis review, courts will uphold a law if it is rationally related to a legitimate government purpose. (*Pennell v. San Jose* (1988) 485 U.S. 1, 14.) Laws may be challenged both as written (a facial challenge) and as applied. (*Tobe v. City of Santa Ana* (1995) 9 Cal.4th 1069, 1114, fn. 4.)

Heightened scrutiny is certainly appropriate when a law discriminates against nonmarital—formerly "illegitimate"—children. (See *Weber v. Aetna Casualty & Surety Co.* (1972) 406 U.S. 164, 175-176.) "The status of illegitimacy has expressed through the ages society's condemnation of irresponsible liaisons beyond the bonds of marriage. But visiting this condemnation on the head of an infant is illogical and unjust. Moreover, *imposing disabilities* on the illegitimate child is contrary to the basic concept of our system that *legal burdens* should bear some relationship to individual responsibility or wrongdoing. Obviously, no child is responsible for his birth and penalizing the illegitimate child is an ineffectual—as well as an unjust—way of deterring the parent." (*Ibid.*, italics added, fn. omitted.)

Because modern DNA testing can readily establish parentage, laws that discriminate against nonmarital children are now seldom justified.[1] (See, e.g., *Clark*, *supra*, 486 U.S. 456.) In *Clark*, a mother filed a support claim on behalf of her nine-year-old child. (*Id*. at p. 457.) In the complaint, the mother named respondent as the father. "The court ordered blood tests, which showed with a 99.3% probability that" the respondent was the father. Pennsylvania courts dismissed "the complaint on the ground that it was barred by a 6-year statute of limitations for paternity actions." (*Id*. at p. 458.) The United States Supreme Court reversed: "To withstand intermediate scrutiny, a statutory classification must be substantially related to an important governmental objective. Consequently we have invalidated classifications that burden illegitimate children for the sake of punishing the illicit relations of their parents, because 'visiting this condemnation on the head of an infant is illogical and unjust.'" (*Id*. at p. 461.)

Under the Pennsylvania law, "an illegitimate child must prove paternity before seeking support from his or her father, and a suit to establish paternity ordinarily must be brought within six years of an illegitimate child's birth. By contrast, a legitimate child may seek support from his or her parents at any time." (*Clark*, *supra*, 486 U.S. at p. 457.) On review, the Supreme Court found "that increasingly sophisticated tests for genetic markers permit the exclusion of over 99% of those who might be accused of paternity, regardless of the age of the child. [Citation.] This scientific evidence is available throughout the child's minority, and it is an additional reason to doubt that Pennsylvania had a substantial reason for limiting the time within which paternity and

---

[1] Equal protection analysis is not static, courts can properly take into account changing circumstances. (See *National Coalition for Men v. Selective Service System* (S.D. Tex., Feb. 22, 2019, No. H-16-3362) 2019 U.S. Dist. Lexis 28851, p. *25 ["while historical restrictions on women in the military may have justified past discrimination, men and women are now 'similarly situated for purposes of a draft or registration for a draft'"]; see also *Obergefell v. Hodges* (2015) __ U.S. __ [135 S.Ct. 2584, 2589] ["When new insight reveals discord between the Constitution's central protections and a received legal stricture, a claim to liberty must be addressed"].)

3

support actions could be brought." (*Id.* at p. 465.) Further, the Court reasoned that: "'The unwillingness of the mother to file a paternity action on behalf of her child, which could stem from her relationship with the natural father or . . . from the emotional strain of having an illegitimate child, or even from the desire to avoid community and family disapproval, may continue years after the child is born.'" (*Id*. at p. 463.) The Court concluded that the paternity statute, which resulted in the disparate treatment of nonmarital children "does not withstand heightened scrutiny under the Equal Protection Clause." (*Id*. at p. 465.)

Here, had Jacqueline Stennett (hereinafter "Jackie," A.S.'s mother) and Britel been married when A.S. was born, there is no question that A.S. would have standing to file a cause of action under the wrongful death statute. Due to modern DNA testing, we know that A.S. is unquestionably Britel's "child." (Code. Civ. Proc., § 377.60.) "In California, an action for wrongful death is governed solely by statute, and the right to bring such an action is limited to those persons identified therein." (*Jackson v. Fitzgibbons* (2005) 127 Cal.App.4th 329, 334-335.)

However, under the majority's interpretation and application of the wrongful death statute, A.S. is subject to burdens in order to establish standing solely because she is a nonmarital child. According to the majority: "Our holding would be different if Jackie had obtained a court order declaring paternity during Britel's lifetime. But Jackie knowingly elected not to obtain a paternity declaration in the 10 years after A.S. was born. Had Jackie done so, A.S. certainly would have standing to sue for Britel's wrongful death. [Citations.] A.S. also would have standing if Britel had died before A.S. was born, and if A.S. established paternity by clear and convincing evidence." (Maj. opn., *ante*, at pp. 13-14.)

In California, "the purpose of the wrongful death statute . . . is to compensate for the loss of companionship and for other losses to specified persons as a result of the decedent's death." (*Jackson v. Fitzgibbons*, *supra*, 127 Cal.App.4th at

4

p. 335.)  But I do not think that placing the burden on Alexandra to rely on her father to declare parentage, or her mother to fortuitously file a paternity action before the father's death, is substantially related to that legislative purpose.  (See *Clark*, *supra*, 486 U.S. at p. 463 [an unwed mother may be unwilling to file a paternity action].)  Indeed, were we to find that Alexandra has standing to file a wrongful death action, she would ultimately have to prove damages, consistent with the Legislature's intent.  (See CACI No. 3921.)

Further, the conclusiveness and availability of DNA testing is "an additional reason" to doubt that California has an important governmental interest in placing burdens on nonmarital children that it does not place on other children.  (See *Clark*, *supra*, 486 U.S. at p. 465.)  These additional standing burdens for nonmarital children are not necessary to screen frivolous or illicit wrongful death claims.  In sum, I would respectfully find that the majority's interpretation of the wrongful death statute, which results in the discrimination of nonmarital children, is not substantially related to an important government purpose.  (See *Craig v. Boren*, *supra*, 429 U.S. 190.)

*Plain Meaning Interpretation*

Generally, when interpreting a statute we start with an examination of the language of the statute itself.  (*Mercer v. Department of Motor Vehicles* (1991) 53 Cal.3d 753, 763.)  If the statute's meaning is plainly understood, the language controls. (*Security Pacific National Bank v. Wozab* (1990) 51 Cal.3d 991, 998.)  That is, if the meaning of the statute is clear and unambiguous, we need not refer to its legislative history or other extraneous interpretive aids.  (*Long Beach Police Officers Assn. v. City of Long Beach* (1988) 46 Cal.3d 736, 743.)

"The Legislature's chosen language is the most reliable indicator of its intent because "'it is the language of the statute itself that has successfully braved the legislative gauntlet.'"  [Citations.]  We give the words of the statute 'a plain and commonsense meaning' unless the statute specifically defines the words to give them a

5

special meaning.  [Citations.]  If the statutory language is clear and unambiguous, our task is at an end, for there is no need for judicial construction.  [Citation.]  In such a case, there is nothing for the court to interpret or construe." (*MacIsaac v. Waste Management Collection & Recycling, Inc.* (2005) 134 Cal.App.4th 1076, 1082-1083.)

Under California's wrongful death statute, "children" have standing to file: "A cause of action for the death of a person caused by the wrongful act . . . of another . . . ."  (Code Civ. Proc., § 377.60, subd. (a).)  The word "children" is not defined within the statute, but the word "children" is simply the plural form of the word "child." (Meriam-Webster's 11th Collegiate Dict. (2007) p. 214, cols. 1-2.)  The word "child" is defined as the "son or daughter of human parents."  (*Ibid.*; see also *Wasatch Property Management v. Degrate* (2005) 35 Cal.4th 1111, 1121-1122 ["When attempting to ascertain the ordinary, usual meaning of a word, courts appropriately refer to the dictionary definition of that word"].)

Here, it is undisputed that A.S. is Britel's "child."  Therefore, she has standing to file a cause of action for his alleged wrongful death under the plain meaning of the statute.  The majority's holding that the word "children" can be interpreted by reference to intestacy laws is, as a general proposition, well supported by case law.  (See, e.g., *Cheyanna M. v. A.C. Nielsen Co.* (1998) 66 Cal.App.4th 855, 864-865 ["standing to bring a wrongful death action remains linked to the intestacy laws"].)  But under these circumstances, I cannot reconcile the majority's interpretation of the wrongful death statute with the equal protection guarantees for nonmarital children.


MOORE, J.


6